UNITED STATES of America, Plaintiff,

v.

CAPITOL SERVICE, INC., Kohlberg Theatres Service Corporation, Marcus Theatres Corporation and United Artists Theatre Circuit, Inc., Defendants.

No. 80–C–407.

United States District Court,
E.D. Wisconsin.

June 16, 1983.

See also 89 F.R.D. 578.

Fred E. Haynes, John F. Greaney, J. Robert Kramer, Dorothy E. Hansberry, Attys., Antitrust Div., U.S. Dept. of Justice, Washington, D.C., for plaintiff.

Steven E. Keane, Trevor J. Will, Foley & Lardner, Milwaukee, Wis., and Peter M. Fishbein, Alan L. Mittman, Kaye, Scholer, Fierman, Hays & Handler, New York City, for defendants.

## DECISION AND ORDER

WARREN, District Judge.

This is a civil antitrust action brought by the Government against four motion pic-

ture exhibitors who operate theatres in the Milwaukee area. The defendants, Capitol Service, Inc. ("Capitol Service"), Kohlberg Theatres Service Corporation ("Kohlberg"), Marcus Theatres Corporation ("Marcus"), and United Artists Theatre Circuit, Inc. ("UATC"), operate most of the first-run motion picture theatres in and around Milwaukee. The Government challenges as violative of Section 1 of the Sherman Act the defendants' practice of "splitting," or allocating among themselves, the rights to negotiate for films released by motion picture distribution companies. The Government contends that the defendants' split agreement constitutes a restraint of trade which is *per se* illegal under the Sherman Act. The defendants maintain that the split does not restrain competition and that, even if it does create a restraint, the split is nonetheless "reasonable" when examined under the rule of reason.

Beginning on August 16, 1982, the Court conducted a 4½ week bench trial. The parties have submitted lengthy proposed findings of fact and conclusions of law as well as post-trial briefs. In addition, the *amici curiae* motion picture distribution companies have filed a post-trial brief. The Court now issues this opinion, which shall serve as its findings of fact and conclusions of law required by Rule 52(a) of the Federal Rules of Civil Procedure. Part I of this decision describes the motion picture industry generally and the manner in which films are licensed by distributors to exhibitors. Part II provides background information regarding the motion picture exhibition market in Milwaukee, including information about the defendants and a description of motion picture licensing in Milwaukee prior to the present split agreement. Part III describes the split agreement challenged by the Government here, including its purpose, its terms, and its effect on the licensing of motion pictures in Milwaukee. Part IV discusses the caselaw applicable to the facts as determined by the Court and, in particular, why the Milwaukee split must be condemned as *per se* illegal under the Sherman Act. Finally, Part V considers the scope of relief to be granted in view of the Court's determination of *per se* illegality.

## I. THE MOTION PICTURE INDUSTRY

The motion picture industry encompasses three operations: production, distribution, and exhibition. Producers make motion pictures and enter into agreements with distributors to have their films placed nationally into theatres owned and operated by exhibitors. Some distributors are also motion picture producers. In some instances, distributors will finance the production of films by independent producers.

There are seven major distributors of motion pictures: Buena Vista Distribution Co., Inc. ("Buena Vista"), which distributes Walt Disney pictures; Columbia Pictures Industries, Inc. ("Columbia"); Paramount Pictures Corp. ("Paramount"); Twentieth Century-Fox Film Corp. ("Fox"); MGM–UA Entertainment Co. ("UA" or "United Artists"); Universal Film Exchanges, Inc. ("Universal"); and Warner Brothers Distributing Corp. ("Warner Bros."). Metro-Goldwyn-Meyer was formerly a major distributor. In 1982 it merged with United Artists. In addition to the major distributors, there are a large number of so-called "independent" distributors. Among the largest of the independents (in terms of annual rental revenue) are Embassy Pictures Corp. ("Embassy", formerly "Avco Embassy") and Orion Pictures, Inc. ("Orion," formerly Filmways, Inc., "Filmways").

Although the structure of the distributor network varies somewhat from distributor to distributor, major distributors and some of the prominent independents generally market their pictures through nationwide marketing networks consisting of branch, district, and regional offices, each having responsibility for distribution in a particular geographic area. The distributors are responsible for planning and financing national, regional, and local advertising campaigns and promotional efforts in regard to the exhibition of their films. At the national level, the distributors assume the full cost of such efforts. At the local levels, the distributors pay most of the advertising

costs during the early weeks of a film's exhibition, although the exhibitors also contribute.

Motion pictures are licensed (rather than sold) to exhibitors by distributors on a picture-by-picture, theatre-by-theatre basis in each local market. License agreements for the exhibition of pictures generally include, among other things, percentage terms for film rental, specific playdates and length of playtime (including holdover provisions). The agreements may also include guarantees and advances.

The percentage terms for film rental generally provide for the distributor to receive a percentage of the gross or net box office receipts. Typical percentage rental terms are calculated on the basis of "90/10 versus the floor." Under this formula, the exhibitor pays to the distributor for each week of playtime the higher of (a) 90% of the gross box office income after the theatre's "house allowance" has been deducted or (b) a percentage of the gross box office without any deductions (the "floors"). A typical rental provision in Milwaukee for an eight-week long run might be as follows: the first two weeks at 70%; the second two weeks at 60%; the third two weeks at 50%; the fourth two weeks at 40%; and a holdover provision of 35% for each holdover week.

A guarantee is a minimum film rental payment that the exhibitor promises to pay the distributor regardless of the amount of film rental earned under the percentage rental terms in the contract. In the event that the film rental earned under the percentage rental terms in the contract exceeds the amount of the guarantee, the film rental earned in excess of the guarantee is also paid to the distributor. A guarantee is generally paid prior to a film's exhibition. An advance is an advance payment of film rental which is applied against the film rental actually earned under the percentage rental terms of the contract. Unlike a guarantee, any portion of the advance not earned under the percentage rental terms in the contract is refunded or credited to the exhibitor. The existence of guarantees

or advances in a license agreement is important to a distributor's decision to award a film license.

Guarantees are important to distributors in a number of respects. As indicated above, if the percentage film rental is less than the amount of the guarantee, the distributor still receives the guaranteed film rental. In effect, the guarantee is a method by which the exhibitor shares with the distributor some of the risk inherent in producing and distributing motion pictures. Guarantees are also important to distributors because, as advance payments, they allow a distributor to recoup part of its investment before a picture is actually exhibited. In addition, guarantees assure prompt payment from exhibitors, who sometimes withhold portions of amounts due under a license agreement if a picture does not do particularly well at the box office.

The first exhibition of a motion picture in a market is referred to as its "first-run." Subsequent runs of pictures in the same market are known as "sub-runs." However, certain pictures (often classics such as Walt Disney's "Fantasia" and "Bambi") are re-released from time to time and are treated as first-run pictures.

Distributors frequently inform exhibitors of the release of new films by exhibitor solicitation letters. Such letters typically contain a synopsis of the film, the director and cast, the film's release date, the date bids are due, and suggested minimum terms. Often a distributor's suggested terms are called "national terms," meaning that the terms suggested are the same nationally for similar local markets.[1]

The manner in which film licenses are awarded may vary from market to market or from time to time in any particular market. In some markets, licenses are awarded through a process of bidding, in which competing exhibitors submit bids for the right to play particular films at particular theatres. Often this bidding process results in a distributor awarding a license which pro-

---

1. Of the major distributors, only Universal does not suggest minimum terms.

vides for terms which exceed those suggested in solicitation letters. Sometimes film licenses are awarded through a process of competitive negotiations. Rather than solicit bids, a distributor will negotiate with more than one exhibitor for the right to play a particular film. By industry custom, licenses awarded by bidding or by competitive negotiation are not subject to "adjustment," i.e., the downward adjustment of rental owed by the exhibitor after the picture has played and not done as well as expected at the box office. Licenses which are not subject to adjustment are considered in the industry to be "firm." In some instances, film licenses are awarded by noncompetitive negotiation. This is the case in so-called "closed towns," i.e., markets in which only one exhibitor has theatres. Where noncompetitive negotiations occur, license terms generally are not firm but rather are subject to adjustment.[2]

In any given exhibition market, certain theatres may be considered superior in terms of grossing potential. Sometimes distributors believe that they can obtain the best playoff of their pictures by establishing relationships with particular exhibitors who will play most or all of their films. Distribution of films in this manner is known as a "track" system. Track systems exist in a number of motion picture exhibition markets around the country.

Often films are licensed before a print is available to be "trade screened" for exhibitors. In such instances, exhibitors must make offers on a film based on available information, which might include a description of the plot and the names of the actors, the director, and other key personnel involved in making the film. This type of licensing is known as "blind bidding" and is, to say the least, extremely unpopular with

exhibitors. Twenty-three states have enacted anti-blind bidding statutes which preclude distributors from licensing films before they are trade screened. Such legislation is presently the subject of constitutional challenge.[3]

The peak seasons for motion picture attendance are the summer and holidays. During such periods, there is intense competition among distributors to obtain what they believe to be the better theatres in a given market. Better quality films are released during the peak seasons. At other times during the year, there are not as many good films available, and thus competition among exhibitors becomes more intense for the good product available.[4]

The Court now turns its attention to the first-run motion picture exhibition market in Milwaukee, which is the focus of this lawsuit.

## II. THE MILWAUKEE MARKET

Milwaukee County and the Eastern part of Waukesha County make up the Milwaukee motion picture exhibition market. In the Milwaukee market there are five exhibitors who operate regular first-run theatres. Four of those exhibitors are the defendants; the fifth is General Cinema, which operates only two first-run theatres (the Brookfield Square and the Westlane), which have a total of four screens. General Cinema is the nation's largest exhibitor, operating almost 1000 screens. Defendant UATC is the second largest, having interests in almost as many screens nationwide as General Cinema. UATC operates six theatres in Milwaukee, four of which (the Northridge, Southridge, Southgate, and Mayfair) can be considered first-run. UATC's first-run screens in Milwaukee total eleven. Defendant Marcus operates over 50 theatres

2. Universal has a policy against granting any adjustments. Evidence presented at trial suggested that such policy could hinder the distributor's ability to license films at better theatres in a market in which exhibitors split pictures.

3. Wisconsin does not have an anti-blind bidding statute.

4. There was conflicting evidence presented at trial concerning whether there was a shortage of motion pictures for the exhibitors in Milwaukee to play. The fact that eight new first-run screens were opened in Milwaukee by the defendants immediately prior to the formation of the present split tends to undermine the defendants' claim that there was a severe shortage of films.

around the State of Wisconsin, twelve of which are in Milwaukee. Of those twelve, four can be considered first-run (the Northtown, Southtown, Capitol Court and Skyway, which have a total of eleven screens). One other Marcus theatre in Milwaukee (the Prospect Mall) plays first-run films only occasionally. Defendant Capitol Service operates eight theatres in Madison, Wisconsin and licenses films for five theatres in Milwaukee, some of which it also operates. Of the five, three can be considered first-run theatres (the Brownport, Mill Road, and Spring Mall, which have a total of eight screens). The other two theatres for which Capitol Service licenses films in Milwaukee (the Fox Bay and Downer) occasionally play first-run films. Defendant Kohlberg operates over 20 theatres in Illinois, Indiana, Michigan and Wisconsin. Three of these theatres are in Milwaukee, only one of which (the Point) is considered to be a first-run theatre. The Point has three screens. Government Exhibit (GX) 3 accurately depicts the first-run theatres in Milwaukee.

Since 1975, most motion pictures have been offered for first-run exhibition in Milwaukee on a multiple-run basis, meaning that a picture is licensed to more than a single theatre for a particular run. Generally, as part of the license agreement, a theatre is given a "clearance" over other theatres in the same geographic area. Thus, for example, if a popular film such as "The Empire Strikes Back" is licensed to play at the Northtown, the distributor will agree not to license the film to the Northridge, the Mill Road, and the Brownport. All of those theatres are considered to be in the same geographic zone.

In addition to the first-run theatres operated in Milwaukee by the four defendants and General Cinema, there are a number of outdoor theatres (drive-ins) which sometimes play first-run films but, for the most part, do not compete with the first-run indoor theatres because they draw a different type of customer. There are also a number of sub-run theatres which play predominantly films which have already completed a first-run or so-called "exploitation" films

(e.g., films featuring "kung fu," horror films, or other low-quality films that enter and exit the market quickly).

The present split agreement entered into between the defendants in this action in 1977 (described more fully below) was preceded by a period in which the licensing of first-run films in Milwaukee was characterized by extensive competitive bidding among exhibitors. During that period, there was no split agreement in effect. Prior to this bidding period, the licensing of first-run films in Milwaukee was governed by an "arrangement," the details of which are in dispute. The defendants contend that the arrangement was a track system. However, the credible evidence presented at trial indicated that the earlier arrangement was a distributor-by-distributor split, meaning that the exhibitors allocated among themselves the right to negotiate with particular distributors for the licensing of films at particular theatres. This arrangement collapsed in 1975 when Capitol Service licensed the film "Lucky Lady" outside the terms of the split agreement.

With the collapse of the distributor-by-distributor split, the first-run exhibition market in Milwaukee became a bidding market. Distributors would send out bid solicitation letters to the various exhibitors, and the exhibitors would independently respond to the solicitations with bids which often exceeded the suggested terms contained in the solicitation letters. This was not the case with every film. Some films were licensed by negotiation, even after bids had been submitted by various exhibitors. And some distributors demonstrated a particular affinity for licensing their films at certain theatres. But for the most part, on those films perceived by the exhibitors to be potentially high-grossing films, competitive bids were submitted. Exhibitors competed by bidding for pictures to play at theatres which competed for business in the same geographic zones. A substantial proportion of the films licensed during this period were awarded by competitive bid.

The characteristics of the bidding period are highlighted by various admissions made by representatives of the defendants. Arnie Lewis, film buyer for UATC, testified during trial regarding the strategy involved in bidding on pictures:

Q Mr. Lewis, if opposition theaters were not booked, you took that into consideration in deciding whether to bid; is that correct?

A That is correct.

Q So, you took into consideration whether they might be submitting a bid on a picture that you were interested in having; is that correct?

A I had to assume that if they weren't booked in some instances like myself they would be bidding and in some instances like myself they would be trying to negotiate for a picture.

Q And if you were interested in getting a film and you knew your opposition theaters were not booked for that time period, you would submit a bid?

A Based upon our appraisal of that picture.

Q That is, if you thought it was a good picture?

A If we thought it was a good picture on occasion we would submit a bid.

(Tr. 2488–89). John Bischof, film buyer for Kohlberg, testified during his deposition:

Q But, you don't give them a higher guarantee than they asked for today under this?

A That's correct.

Q But, before the split you would?

A Before that, yes. They were looking for more money or you went after a picture and you knew that the other party was giving a certain amount. Then you knew you had to wind up going higher than they did.

Q You are referring to the other party?

A Well, meaning one of the other theatre owners.

Q So, you're saying before the split and putting in the guarantee, you took into consideration the fact that other exhibitors would be submitting bids?

A Yes.

(Bischof Rule 30 Dep. at 33.) Angelo Porchetta, Capitol Service's vice-president and film buyer explained during trial the effect that bidding had on the terms offered for films by competing exhibitors:

We tried to get them as cheap as we could, but you never knew how your opposition felt about the picture. You had no idea if he was going to go crazy for the picture or not. Now, I would start moderately, then if I was losing three, four, five, six pictures in a row, I would start panicking, I would figure I have got three screens in the Mill Road, Christmas is coming, what am I going to play.

I still saw my opposition had three, four, five, six screens open, so he would be fighting to fill in his screens, so I started jacking up my guarantees.

(Tr. 3038–39.)

As the Court will discuss in Part III of this opinion, it was the exhibitors' concerns regarding price competition among themselves (including the "jacking up" of guarantees) which led to the present split agreement in Milwaukee. Suffice it to say for now, however, that during the bidding period prices (*i.e.*, the terms offered by exhibitors for motion picture licenses, including percentage terms, playtime, guarantees, and advances) were substantially influenced by the existence of competitive bidding among the exhibitors.

### III. THE MILWAUKEE SPLIT

There is no dispute in this case that the defendants are involved in a split agreement which affects the manner in which first-run motion pictures are licensed in Milwaukee. On November 30, 1977, representatives of each defendant met at the O'Hare Hilton near Chicago and agreed to form a split and established a procedure by which the split would operate. Under the agreement, the defendants have grouped their theatres that primarily exhibit first-run motion pictures into three units of eleven screens each. On occasion, some of the

defendants' theatres that are not included in the three units have been split pictures under the split agreement. Under the agreement, Marcus and UATC each constitute one unit since each has eleven primarily first-run screens in Milwaukee. Capitol Service, which has eight primarily first-run screens, and Kohlberg, which has three primarily first-run screens, together form the third unit. The defendants meet periodically or converse by telephone to split pictures.

The split is a "picture-by-picture" split, meaning particular films are allocated to specific theatres. The exhibitors take turns selecting films for their respective theatres, making sure that no two theatres in the same geographic zone play the same film. Because General Cinema, which is not involved in the split, has two first-run theatres in Milwaukee, the defendants will sometimes "split around" the General Cinema theatres, meaning that they leave a run of the picture open in the event one of General Cinema's theatres obtains a license for the picture.

The above description of the Milwaukee split is undisputed by the parties. The parties disagree, however, in regard to other aspects of how the split operates. The Court will discuss these below, but first it examines the defendants' purpose in entering into the split agreement.

### A. The Defendants' Purpose

The record before the Court is replete with damning admissions by the defendants with regard to why they entered into the present split agreement. The defendants offered at trial a number of reasons why they initiated the split, but the credible evidence presented leads the Court to conclude that the defendants were motivated by an anticompetitive purpose.

The Government asserted at various times during the trial that the pretrial deposition testimony of various representatives of the defendants admitted into evidence was the heart of its case. The Court would agree that these various statements by the defendants are the strongest indication of the defendants' purpose in splitting pictures.[5]

Ben Marcus, the president of Marcus Theatres, made numerous statements in regard to his dissatisfaction with competitive bidding which show that he felt the prices exhibitors had to pay were unreasonable:

Q. Can you describe some of the circumstances leading up to Marcus Theatre's decision to resume splitting in '77?

A. Yes. Well, we were bidding for a product and it became so intolerable we just couldn't pay our bills any more. The film—the extortion of the terms that they got from us was impossible....

(Marcus Civil Investigative Demand (CID) Dep. at 20.) Again, Marcus:

Q. But before the split did you not sometimes have to exceed national terms?

A. Well, when you bid—

Q. When you bid.

A. Sure. When you bid and if you want a picture you can—maybe the picture might do some business for you. You go crazy.

Q. You do exceed national terms then?

A. You have those God damn guarantees that kill you....

(Marcus Rule 30 Dep. at 32–33.) Marcus used colorful language to describe the effect of the bidding process on exhibitors, including "murder" (CID Dep. at 30), "rape" (CID Dep. at 30), "extortion" (CID Dep. at 20), and "cremat[ion]" (CID Dep. at 25). Marcus also explained the motivation for the split:

[T]he film companies were winding up with all the money, and we've got to save

---

**5.** The only evidentiary matter left open at the end of trial concerned the defendants' submission of counter-designations to the Government's deposition extracts. The parties were not able to resolve all disputes regarding admissibility, as indicated in their letters to the Court dated March 29, 1983, and April 8, 1983. The Court has examined the defendants' counter-designations (DX 717), including those to which the Government objects, and concludes that their admission into evidence does not affect the Court's decision.

ourselves from disaster. And after it got good and bloody, it [sic] decided to sit down and make a split again. Each one of them takes certain pictures and show them in the theatres.

(Marcus CID Dep. at 15–16.) Marcus went on to testify:

Q Do you recall any conversation with any of the other exhibitor representatives in which they told you that they were getting murdered in Milwaukee?

A I—I know all our buyers were crying on each other's shoulders, all saying they were getting murdered.

Q At the meeting?

A It was no secret.

Q Was that because of the terms?

A That's what brought the meeting about. Especially when we're getting raped. We're trying to see if we can stop this raping.

Q Were other solutions proposed at this meeting?

A None. The only solution we know would be a split.

(Marcus CID Dep. at 30–31.)

Representatives of the other defendants expressed similar views regarding why the split was needed. Angelo Porchetta of Capitol Service substantially confirmed during his Rule 30 deposition the accuracy of a statement attributed to him in the May 6, 1980, *Wall Street Journal* regarding the reason for the split: "We couldn't afford the ridiculous deals and guarantees it took to out bid the other guys." (Rule 30 Dep. at 72.) Capitol Service's president, Dean Fitzgerald, described the benefits expected from splitting in a memorandum dated December 8, 1978:

As background, product splits are nearly as old as the business and are very effective as a marketing tool to provide for even distribution of product and to avoid overpayment excesses that exist in open bidding.

(GX 39.) In a later memorandum, Fitzgerald explained the purpose of splitting as follows:

It was clearly set forth that the base cause of the split was not to prevent payment of requested terms of the film companies but to prevent overpayment of unrequested terms. Overbidding on a product where you cannot measure its worth is the inevitable consequence of the open bidding process and the exhibitors cannot protect themselves against it.

(GX 41.) John Bischof of Kohlberg acknowledged during his CID deposition that one of the problems with bidding was the necessity for competing exhibitors to "go a little overboard on bidding" (Bischof CID Dep. at 42–43).

In addition to the foregoing admissions made by the defendants, there was credible testimony presented at trial by various representatives of the distributors in regard to statements made to them by the defendants about the purpose of the split. For example, Juanita Dyskterhuis testified that representatives of each defendant told her the split was entered into to avoid excessive guarantees. (Tr. 3236.) Charles Good of Buena Vista recalled a similar statement having been made by Ben Marcus (Tr. 1272), as did Paul Silk of Orion (Tr. 840). Carol Sutter of Buena Vista testified that she heard Ben Marcus tell the audience at a luncheon that the Milwaukee theatres had entered into the split to avoid paying too much film rental, high guarantees, and unreasonable playing time. (Tr. 1125.)

Such statements by the defendants can lead the Court to no other conclusion but that the Milwaukee split was entered into by the defendants for the purpose of eliminating competition among themselves. The testimony offered at trial on behalf of the defendants regarding their reasons for entering into the split simply lacked credibility given the admissions made prior to trial. Thus, the Court does not believe that the split was entered into simply to provide a more orderly method of distribution of films or to provide better access to popular films for the movie-going public. Nor does the Court believe that the split was formed as a method of dealing with the evils of "blind bidding." There was evidence

presented at trial indicating that the defendants split not only films which they have not seen (*i.e.,* those which have not been trade screened), but also films which they have seen (such as some of the Walt Disney films re-released from time to time by Buena Vista). While the Court would agree that blind bidding presents greater risks for exhibitors and thus is undesirable from their standpoint, the record before the Court reveals that the defendants' overriding concern was the "excessive terms" obtained by the distributors through the competitive bidding process, not simply the risks involved in blind bidding.

The Court now turns its focus to the manner in which the Milwaukee split has operated.

### B. *How the Split Operates*

At the beginning of Part III, the Court described some of the basic attributes of the Milwaukee split which are uncontested by the parties. The Government contends that, in addition to their agreement regarding the basic mechanics of the split, the defendants have entered into three fundamental agreements which facilitate the split's anticompetitive purpose: (1) an agreement not to bid on pictures; (2) an agreement not to negotiate for a picture until it is split; and (3) an agreement not to negotiate for a picture split to another exhibitor. The defendants maintain that none of these agreements exist. They assert that the split does not preclude exhibitors from submitting competitive offers and that exhibitors will, in fact, negotiate with distributors for licenses outside of the split. According to the defendants, the split does not lock distributors into playing their films at particular theatres. All the split does, maintain the defendants, is allocate among exhibitors the "right of first negotiation" for the films split. As the Court discusses below, however, the so-called "right of first negotiation," even as described by the defendants,[6] is an impediment to price competition in the market. The evidence strongly

supports the Government's contention regarding the existence of the three agreements noted above.

#### 1. *The Agreement Not to Bid*

A number of statements made by representatives of the defendants in pretrial depositions and at trial indicate that an essential term of the split is an agreement not to engage in competitive bidding. Ben Marcus admitted during his CID deposition that the essence of the split was to eliminate bidding (CID Dep. at 75) and that the exhibitors are no longer bidding in Milwaukee (CID Dep. at 57). He testified during trial that, after the split began, the exhibitors would simply discard the bid solicitations sent by distributors to exhibitors. (Tr. 3737.) Arnie Lewis of UATC testified during his CID deposition that exhibitors in Milwaukee do not bid on pictures anymore because of the split agreement. (CID Dep. at 54.) He also testified that, after the split took effect, the exhibitors would respond to bid solicitations with letters indicating they were willing to negotiate for pictures. (CID Dep. at 142.) At trial, Lewis testified:

Q. Mr. Lewis you don't bid in Milwaukee because of the split agreement, isn't that a fact?

A. Correct.

(Tr. 2514.) Angelo Porchetta of Capitol Service, while stating that he might bid against General Cinema, testified in his Rule 30 deposition that split members would not bid against another member who had been allocated a picture for a particular zone. (Rule 30 Dep. at 85–87.) Michael Kominsky, Marcus' film buyer, testified in his CID deposition:

If we were going to have an arrangement like this [a split agreement] none of us would be responding to a bid. I, myself, would always send a letter to negotiate on most of the films that I wanted to negotiate on.

(Kominsky CID Dep. at 34.)

At trial, representatives from the distributors testified to other statements made by

---

**6.** When asked during trial how long the "right of first negotiation" for a film would last, Michael Kominsky of Marcus could state only that it lasted a "reasonable amount of time."

(Tr. 2961–62). The response tends to show how little substance there is behind the defendants' phraseology.

the defendants which further support the Government's contention that an essential element of the split has been an agreement not to bid on pictures. The Court will not go into any detail regarding these statements but would simply cite the credible testimony of Buena Vista's Carol Sutter (Tr. 1130), and Embassy's William Shields (Tr. 2026). In addition, a memorandum sent by Angelo Porchetta to Paul Silk (then of Avco Embassy) in May 1978 indicates that defendant Capitol Service had ceased bidding. (GX 120.)

In addition to statements made by the defendants, the Government presented statistical evidence showing that bidding declined dramatically in Milwaukee after the split took effect. For the years 1976 through 1981, the number of bids submitted by the defendants' indoor theatres to the seven major distributors, Filmways, and Embassy were as follows:

| Year | No. of Pictures Upon Which Bids Submitted | No. of Bids |
|------|-------------------------------------------|-------------|
| 1976 | 68 | 322 |
| 1977 | 74 | 317 |
| 1978 | 4 | 5 |
| 1979 | 2 | 12 |
| 1980 | 1 | 1 |
| 1981 | 0 | 0 |

(GX 6; GX 8.)

The defendants do not contest the fact that the number of bids decreased, but instead assert that there is no evidence that the split caused the decline in bids. They contend that it was not the split which curtailed bidding but rather the distributors' own policies. But the testimony presented at trial by various distributors' representatives was unanimous in regard to the distributors' affinity for bidding. The distributors continued to solicit bids after the split began, but the bids stopped coming.[7] The defendants contend that if the distributors would have "insisted" on bidding with regard to any particular film, bidding would have occurred. They cite as their basis for this contention the number of bids received for the picture "Star Trek" in 1979. But the circumstances surrounding the licensing of "Star Trek" were somewhat unusual.[8] Moreover, there were discussions among the defendants in regard to whether bids would be submitted for the film. Thus, the fact that the defendants on occasion submitted bids does not mean the split agreement had no effect on bidding. Given the various statements made by the defendants indicating that an essential part of the split was the elimination of bidding, it is more than reasonable to infer from the Government's statistical evidence that the reduction in the number of bids was caused by the split.

The defendants also contend that the Government failed to introduce any evidence that a term of the split was an agreement not to bid for pictures. There was testimony on behalf of the defendants (Marcus testimony, Tr. 3673) that no such agreement existed. It was not necessary, however, that the Government prove an

---

7. Representatives of the defendants testified at trial that the bid solicitation letters were simply the method used by the distributors to inform exhibitors of new releases. Distribution company witnesses testified that they continued to solicit bids after the split was formed. This evidence was presented in regard to the defendants' contention that, early on, the distributors (or at least some of them) agreed to go along with the split and at least try it. (See e.g., Marcus testimony, Tr. 3737). At the time of trial, the defendants conceded that the distributors were opposed to the split (which became apparent when distributor witnesses testified). While the Court does not believe that the distributors' alleged acquiescence to the split in its early stages is material to the legal issues presented in this lawsuit, it does not, in any event, believe the defendants' testimony regarding the distributors' willingness to go along with the split. At best, the distributors were skeptical about the Milwaukee split from its inception.

8. Paramount insisted on bidding with regard to "Star Trek." The film was expected to be a great success at the box office. Paramount succeeded in licensing "Star Trek" through bidding, although it took three rebids to accomplish the task. Moreover, the picture was licensed to the three theatres to which it was designated in the split (as well as to two other theatres as add-on runs). The one very large guarantee received ($140,000 from Marcus' Southtown) was the result of bidding in the same geographic zone between the Southtown and the Westlane, which is owned by General Cinema and is not a participant in the split.

express agreement. "It is enough that a concert of action is contemplated and that the defendants conformed to the arrangement." *United States v. Paramount Pictures, Inc.,* 334 U.S. 131, 142, 68 S.Ct. 915, 922, 92 L.Ed. 1260 (1948). The Court believes that the evidence presented amply demonstrates an agreement among the exhibitors not to bid for films.

### 2. The Agreement Not to Negotiate For a Picture Until it is Split

Another fundamental term of the Milwaukee split which the Government has identified and proved is an agreement among the defendants not to negotiate for pictures until they have been split. The defendants' own admissions disclose the existence of such agreement. Arnie Lewis of UATC testified during his CID deposition:

Q. Is it your understanding pursuant to the split that you will not submit an offer for a motion picture until that motion picture has been split?

A. Yes.

(CID Dep. at 57–58.) Lewis testified similarly during his Rule 30 deposition. (Rule 30 Dep. at 76–77.) Michael Kominsky of Marcus gave similar testimony during his CID deposition:

If they [the distributors] call and ask me where a picture is going I will tell them we haven't had a meeting on it if we haven't had a meeting to discuss the movie.

(Kominsky CID Dep. at 114.) Various representatives of the distributors gave testimony at trial regarding conversations in which the defendants indicated their unwillingness to license films until after the films were split, including Buena Vista's Sutter (Tr. 1126), Warner Bros.' Hite (Tr. 351–52, 255–56), Columbia's Rudnitsky (Tr. 2074), and Universal's Miller (Tr. 1382).

The defendants presented testimony at trial regarding a recent change in the operation of the split which would allow films to be licensed before films are split or outside the split. As the Government points out, such change, even if genuine, should have no bearing on the grant of injunctive relief. *See United States v. Oregon State Medical Society,* 343 U.S. 326, 333, 72 S.Ct. 690, 695, 96 L.Ed. 978 (1952). In any event, the Court has reason to doubt the genuineness of the change since licensing pictures outside the split would tend to frustrate the split's purpose and because the supposed change in policy came so close to the time of trial.

### 3. The Agreement Not to Negotiate For a Film Split to Another Defendant

The third fundamental term of the split identified and proved by the Government is an agreement among the defendants providing that one defendant not negotiate for films split to the other defendants. In this regard, it is necessary for the Court to examine the defendants' claim that all they really do in the split is allocate the "right of first negotiation" for particular films.

The "right of first negotiation" appears to the Court to be an empty phrase used by the defendant exhibitors to describe their agreement to negotiate only for the films allocated to their respective theatres. Once a batch of films has been split, the screens for a particular period of playtime are booked up. A distributor has little chance of entering into meaningful negotiations for the licensing of a film at a theatre other than the split designee because other theatres have been designated for other films.[9] This is not to say, however, that, under the split, films have always been licensed in accordance with the original designations made by the exhibitors. The defendants were able to point out at trial a number of instances in which a distributor unhappy

---

**9.** Angelo Porchetta of Capitol Service touched on this point during his CID deposition:

In many cases, they will ask you what are you playing at that period and you tell them if you have your screens filled and that you are playing their picture and that, and the other—and you won't have room for his picture which is—which, in reality, is what happens when you allocate pictures, that you negotiate the ones that are allocated to you. You negotiate for first, assuming you are successful on your three screens or two or one, that ties up that play time.

(Porchetta CID Dep. at 167).

with the theatre to which a particular film had been designated was able to license the film at another theatre. This would occur, however, through a process of accommodation among the exhibitors—a so-called "reworking" of the split. This accommodation by the exhibitors would not involve competitive negotiations; rather, the distributor would have only the exhibitor to whom the split was "reworked" to negotiate with.

The defendants assert that the split has not precluded exhibitors from engaging in competitive negotiations for films, and to prove this point, they introduced at trial evidence regarding several films that were licensed without being split to a particular theatre, including: "Poltergeist"; "Rocky III"; "Pink Floyd's The Wall"; "Yes, Giorgio"; and "Annie." All of these films were licensed close to the time of trial. Some of them were United Artists films which were licensed pursuant to an agreement by which United Artists would license its summer and fall product exclusively to Marcus and UATC.[10] These few examples of films licensed outside the split cannot obscure what appears to the Court to be a fundamental term of the split, *i.e.*, the understanding among the defendants that they are to negotiate for only the films split to their respective theatres.[11]

### C. The Effect of the Split on Competition

The Court has determined above that the defendants' purpose in entering into the current split agreement was to reduce competition in the licensing of motion pictures in Milwaukee. This section of the Court's opinion discusses the evidence which supports the Government's contention that the defendants have been successful in their efforts. The split has had the effect of reducing price competition among the defendants.

As already stated above, the split has reduced significantly the number of bids submitted by the defendants for motion picture licenses. Moreover, the evidence presented shows that the split has virtually eliminated the prospect of competitive negotiations for films, since the defendants generally do not negotiate for films split to other exhibitors unless there is a reworking of the split.

Probably the most dramatic effect of the split has been the reduction in the amount of guarantees paid by exhibitors in Milwaukee. Guarantees fell from $1,820,300 in 1977 to $913,000 in 1978 ($310,000 of which was paid for films licensed before the split) to $687,000 in 1979 to $265,000 in 1980 to $140,000 in 1981. (GX 10.) In its answer to interrogatory 20 of the Government's first set of interrogatories, defendant Marcus admitted that the reduction in guarantees is caused by the split:

> The [split] arrangement . . . has benefited exhibitors by eliminating the need, in most cases, to give large guarantees to distributors for unseen, unproved motion pictures. . . .[12]

(GX 20 at 7.) Salah Hassanein of UATC testified at trial that distributors are able to obtain guarantees on a substantially larger number of films in bidding markets than in splitting markets. (Tr. 3917.) And Ben Marcus testified during his CID deposi-

---

**10.** In regard to the arrangement with UATC, United Artists' vice-president and assistant general sales manager, Buddy Golden, stated: "Although UA would have preferred receiving competitive offers from UATC and its competitors in Milwaukee, your present arrangements have precluded that possibility." (GX 188.)

**11.** At trial, the defendants introduced into evidence letters sent from UATC to various distributors in which UATC stated that it was ready and willing to negotiate for the distributors' films. These letters were offered to show that the distributors, who did not respond to the letters, simply were not interested in com-

petition. The tone of the letters, however, indicates that UATC was not interested in any real competition with the other exhibitors.

**12.** The defendants assert that fewer or smaller guarantees were required because with more runs of a film, clearances would necessarily be smaller, thus obviating the necessity for large guarantees. Yet, even under the defendants' theory, one would expect more smaller guarantees to correspond with the greater number of smaller clearances. One would not expect the overall amount of guarantees paid to decline as sharply as it did. (*See* GX 9, GX 10.)

tion that the split had benefitted his corporation because "[i]t stopped our losses by not paying out the extortion guarantees." (CID Dep. at 89.) Given these statements by the defendants, it is difficult to comprehend the defendants' present contention that the reduction in guarantees in Milwaukee is not the result of the split but rather of some national trend away from the use of guarantees.

Another effect of the split has been an increase in the number of downward adjustments in film rentals obtained by the exhibitors in Milwaukee. As noted in Part I of this opinion, adjustments in film rental terms generally are not given in markets in which competitive bidding or competitive negotiations prevail. This is because an expectation in such markets that adjustments will routinely be given would tend to distort the bidding and negotiation processes. One of the benefits which the defendants in the instant case expected to obtain as a result of splitting was greater ability to obtain adjustments in rental terms. Ben Marcus testified during his CID deposition that one of the benefits of the split to his corporation has been the ability "to negotiate the adjustments for some of the pictures." (CID Dep. at 89.) The testimony of various distribution company witnesses indicated that a result of the split has been an increase of the number of films subject to downward adjustment. (Tr. 106–110; 397–400; 553–54; 827–29; 1007–08; 1131–32; 1304–05; 2094–95; and 2140–43.) This increase in the number of downward adjustments was made possible by the defendants' elimination of competitive bidding and competitive negotiations through the split agreement. As defendant Marcus stated in its answer to interrogatory 20 of the Government's first set of interrogatories:

> The [split] allowed the exhibitors to renegotiate the film rental terms with a distributor when a film did not do as well as expected at the box office.

(GX 20 at 7.)

Another aspect of motion picture licensing affected by the Milwaukee split is the length of playtime for which films are licensed. The defendants have admitted that the split has achieved a general reduction in playtime: "[T]he [split] procedure tends to result in more, shorter runs for a particular film." (GX 20 at 10.)

Each of the above-noted results of the split affects the price paid for films. Guarantees are a component of the overall price paid to license films. They are particularly important when a film does not do well at the box office. In such instances, the distributor is able to recoup part of its investment in the film. But even where a film does well and the percentage rental terms provide the distributor with an amount greater than the amount of the guarantee, the guarantee still has economic value to the distributor because it is an advance payment. Adjustments directly affect the total amount of rental paid for a particular film. The ability of the defendants to obtain adjustments (made possible because of the leverage created by the split) necessarily has an effect on price. Playtime is an important component in establishing the overall price paid for a film because the longer a particular film plays, the more revenue it generates. And even if the shorter playtime resulting from the split coexists with more runs of a particular film, there is nonetheless a predictably adverse effect on the distributors. For one thing, film prints are expensive, and more runs of a particular film mean more prints. More important, however, is the fact that an increased number of runs in a market such as Milwaukee makes it less likely that a distributor will receive rental payments based on the "90/10" formula as opposed to the "floors" (See Part I, *supra*). Thus, decreased playtime, even with more runs of any particular film, has a predictable effect on the price paid to license films, as do fewer guarantees and more adjustments.

Given the strong evidence presented by the Government regarding the anticompetitive effect of the split, the Court will touch only briefly the defendants' evidence concerning the effect of the split. In addition to arguing that the Government failed to

introduce any evidence that the split has reduced overall film rental paid by the defendants to distributors,[13] the defendants contend they have proved that the split has not had an adverse effect on the overall film rentals paid to distributors. The defendants rely principally on the following evidence: (1) GX 275, a study of film rentals paid by UATC's Milwaukee first-run theatres; (2) the testimony of UATC's Arnie Lewis; (3) the testimony of Ben Marcus; (4) Defendants' Exhibit (DX) 509, a study of film rentals UATC paid in the last two years in Milwaukee, Minneapolis-St. Paul, and its entire eastern division of the United States; and (5) the testimony of UATC's Salah Hassanein. The Court will not discuss in detail why such evidence does not support the defendants' contentions. Briefly stated, there are numerous factors which may affect overall film rental paid by exhibitors to distributors in different motion picture exhibition markets or within the same market over time. Such factors are not taken into account adequately by the defendants' evidence. Moreover, the Court perceives the defendants' evidence regarding increased rental payment to be in part an attempt to establish the reasonableness of the film rentals paid by the defendants to distributors. This is not the focus

of the Sherman Act;[14] rather, the Sherman Act ultimately is concerned with the effect of a particular practice on competition. The Government has amply proved the effect in the instant case.

## IV. THE MILWAUKEE SPLIT IS PER SE ILLEGAL

▮ As enacted by Congress, Section 1 of the Sherman Act literally prohibits "every" agreement in restraint of trade. 15 U.S.C. § 1. The Supreme Court has interpreted the statute, however, to condemn only *unreasonable* restraints, and thus, since its decision in *Standard Oil Co. of New Jersey v. United States,* 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed.2d 619 (1911), the Court has analyzed most restraints under the so-called "rule of reason." Under the rule of reason, the inquiry is "whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition or whether it is such as may suppress or even destroy competition." *Chicago Bd. of Trade v. United States,* 246 U.S. 231, 238, 38 S.Ct. 242, 244, 62 L.Ed. 683 (1918). In applying the rule of reason, the trier of fact must weigh the pro- and anticompetitive effects of a challenged restraint to determine whether it is unreasonable. *Continental T.V., Inc. v. GTE Sylvania, Inc.,* 433 U.S.

**13.** At various points during the trial and in their post-trial briefs, the parties have argued whether the Government must prove the split's anticompetitive effect in order to establish illegal price fixing. The defendants assert that the Government failed to meet its burden by not introducing any evidence concerning the split's effect on the overall price (measured as a percentage of box office receipts) paid by the defendants to distributors. The Government had intended to introduce into evidence a rebuttal exhibit for the purpose of establishing such effect. However, when the Court ruled that the defendants were entitled to conduct discovery regarding the exhibit prior to its admission into evidence, the Government withdrew the exhibit for the stated reason of expediting a decision on the merits.

 The often-quoted footnote 59 in *Socony-Vacuum* leaves little doubt that, where price fixing is involved, liability under Section 1 may be established without proving both a purpose and a power to fix prices. *United States v. Socony-Vacuum Oil Co.,* 310 U.S. 150, 224–26 n. 59, 60 S.Ct. 811, 844–46 n. 59, 84 L.Ed. 1129 (1940).

"[I]t is well established that a person 'may be guilty of conspiring although incapable of committing the objective offense.' " *Id.* (quoting *United States v. Rabinowich,* 238 U.S. 78, 86, 35 S.Ct. 682, 684, 59 L.Ed. 1211). *See also, McClain v. Real Estate Bd. of New Orleans,* 444 U.S. 232, 243, 100 S.Ct. 502, 509, 62 L.Ed.2d 441 (1980). It seems only sensible, however, that where an agreement is alleged to fix prices only indirectly, there must be some evidence or at least an obvious connection linking the challenged arrangement to price. Thus, in order to prove an arrangement falls within the *per se* category called "price fixing," it is necessary to show in some way that price is affected. The Court believes that the Government has adequately demonstrated such effect on price in the instant case.

**14.** "Whatever reasonable justification particular price-fixing agreements may be thought to have, the law does not permit an inquiry into their reasonableness." *United States v. Socony-Vacuum Oil Co., supra,* 310 U.S. at 226 n. 59, 60 S.Ct. at 846 n. 59.

36, 49–50, 97 S.Ct. 2549, 2557, 53 L.Ed.2d 568 (1977).

■ Certain business relationships have been determined to be so plainly anticompetitive that an elaborate analysis of their competitive virtues is not required. Such restraints are said to be "illegal *per se*." Once a court has determined that a particular practice is governed by the *per se* rule, it need not engage in the lengthy balancing inquiry required by the rule of reason. However, the *per se* rule is not simply a substitute for analysis but instead a rule of judicial experience which enables a court to predict with confidence that the rule of reason would condemn a particular practice. It is a "conclusive presumption that the restraint is unreasonable." *Arizona v. Maricopa County Medical Society,* 457 U.S. 332, 102 S.Ct. 2466, 73 L.Ed.2d 48 (1982). Even in a case in which a challenged restraint is determined to be illegal *per se,* the Court must analyze the circumstances of the restraint to determine whether it is among those business practices which warrant the conclusive presumption of unreasonableness. *See, generally,* P. Areeda, *The "Rule of Reason" in Antitrust Analysis: General Issues* (Federal Judicial Center 1981).

Among those agreements which have been found to be unlawful in and of themselves are price fixing and division of markets (market allocations). *See Northern Pacific R. Co. v. United States,* 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958). In the instant case, the Government asserts that the defendants' split agreement constitutes both a price-fixing and a market allocation agreement. As such, the Government contends that the split must be condemned as *per se* unlawful. The defendants maintain that the split agreement must be analyzed under the rule of reason and accordingly offered evidence at trial regarding alleged procompetitive benefits produced by the split. The Court discusses below why these alleged benefits must be rejected and why the split is a *per se* illegal restraint of trade.

### A. Price Fixing

■ The Supreme Court has recognized since *Standard Oil* that inquiry under the rule of reason ends once a price-fixing agreement is proved. As the Court stated in *United States v. Trenton Potteries,* 273 U.S. 392, 47 S.Ct. 377, 71 L.Ed. 700 (1927);

The aim and result of every price-fixing agreement, if effective, is the elimination of one form of competition. The power to fix prices, whether reasonably exercised or not, involves power to control the market and to fix arbitrary and unreasonable prices. The reasonable price fixed today may through economic and business changes become the unreasonable price of tomorrow. Once established, it may be maintained unchanged because of the absence of competition secured by the agreement for a price reasonable when fixed. Agreements which create such potential power may well be held to be in themselves unreasonable or unlawful restraints, without the necessity of minute inquiry whether a particular price is reasonable or unreasonable as fixed and without placing on the government in enforcing the Sherman Law the burden of ascertaining from day to day whether it has become unreasonable through the mere variation of economic conditions.

*Id.,* at 397–98, 47 S.Ct. at 379–80

In *United States v. Socony-Vacuum Oil Co.,* 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129 (1940), the Court concluded that an agreement among competitors which indirectly fixed prices was *per se* unlawful. In that case, major oil refiners engaged in a concerted effort to purchase and store surplus gasoline in order to maintain stable prices. The defendants argued that the agreement was necessary to avoid cutthroat competition. The Court stated:

Any combination which tampers with price structures is engaged in an unlawful activity. Even though the members of the price-fixing group were in no position to control the market, to the extent that they raised, lowered, or stabilized prices they would be directly interfering

with the free play of market forces. The Act places all such schemes beyond the pale and protects that vital part of our economy against any degree of interference.

*Id.* at 221, 60 S.Ct. at 843.

Two more recent Supreme Court decisions involving price fixing are of particular importance to the instant case. In *National Society of Professional Engineers v. United States,* 435 U.S. 679, 98 S.Ct. 1355, 55 L.Ed.2d 637 (1978), an agreement among competing firms of professional engineers to refuse to discuss prices with potential customers until after negotiations resulted in the initial selection of an engineer was held unlawful without requiring further inquiry into the reasonableness of the restraint at issue. The agreement operated as a ban on competitive bidding. While noting that the agreement was "not price fixing as such," the Court determined that no elaborate industry analysis was required to demonstrate the anticompetitive character of such an agreement. *Id.* at 692, 98 S.Ct. at 1365. The agreement was held to be "[o]n its face" a restraint of trade within the meaning of Section 1 of the Sherman Act.[15] *Id.* at 693, 98 S.Ct. at 1366. In *Catalano v. Target Sales, Inc.,* 446 U.S. 643, 100 S.Ct. 1925, 64 L.Ed.2d 580 (1980), the Court held unlawful an alleged agreement among beer wholesalers to eliminate short-term credit to retailers and to require cash payments. The Court characterized credit terms as an "inseparable part of the price" and thus concluded that an agreement to terminate the practice of giving credit fell "squarely within the traditional *per se* rule against price fixing." *Id.* at 648, 100 S.Ct. at 1928.

*National Society* is instructive in the instant case in regard to the defendants' elimination of bidding as a method of licensing films. In *National Society,* the Court noted that the Society's ban on bidding " 'impedes the ordinary give and take of the market place,' and substantially deprives the customer of 'the ability to utilize and compare prices in selecting engineering services.' " 435 U.S. at 692–93, 98 S.Ct. at 1365–66 (quoting from the district court's opinion, 404 F.Supp. 457, 460). Essentially the same thing can be said in the instant case with regard to the split agreement's effect on the licensing of motion pictures. The split agreement, although not uniformly enforced by the defendants, has for the most part eliminated competitive bidding as well as competitive negotiations among the exhibitors in Milwaukee. By limiting the distributors' choices through allocation of new films to be released, the defendants have deprived the distributors of the ability to compare simultaneous offers to license their films.

The analogy to *Catalano* is even more direct. There, the Court held that an alleged agreement to eliminate one of the components of price (credit terms) was *per se* unlawful price fixing. In the instant case, the Court has determined above that one of the purposes and effects of the defendants' split agreement has been a reduction in the amount of guarantees paid to the distributors. Guarantees, like credit terms, are an important part of the price paid to license films. The Court has also found above that the split agreement has affected two other aspects of price: the ability of the defendants to obtain downward adjustments and their ability to obtain shorter playtimes. Price is necessarily affected by the split agreement.

Of course, not every arrangement that affects prices must be condemned *per se* as "price fixing." *Arizona v. Maricopa County Medical Society,* 102 S.Ct. at 2482 (Powell, J., dissenting). In *Broadcast Music, Inc. v. Columbia Broadcasting System, Inc.,* 441

---

**15.** Throughout the litigation, the defendants have argued that *National Society* is not a case involving application of the *per se* rule. Although Justice Stevens did not actually state that the condemned restraint of trade was *per se* unlawful, the analysis applied was that of the *per se* rule. Subsequent decisions of the Supreme Court support this view. *See, Arizona v. Maricopa County Medical Society,* 457 U.S. 332, 102 S.Ct. 2466, 2483, 73 L.Ed.2d 48 (1982) (Powell, J., dissenting); *Catalano, Inc. v. Target Sales, Inc.,* 446 U.S. 643, 647, 100 S.Ct. 1925, 1927, 64 L.Ed.2d 580 (1980).

U.S. 1, 99 S.Ct. 1551, 60 L.Ed.2d 1 (1979), the Supreme Court determined that blanket licensing of performance rights sold by copyright clearinghouses constituted "price fixing" in only the literal sense. The Court ruled that the legality of blanket licenses could not be determined under the *per se* rule because such licenses yielded substantial efficiencies that would not be realized through individual licensing. *Id.* at 20–21, 99 S.Ct. at 1562–63. In addition, the Court determined that the blanket license was, "to some extent, a different product." *Id.* at 22, 99 S.Ct. at 1563.

The defendants in the instant case rely on *Broadcast Music* as controlling. There are fundamental differences, however, between the blanket licenses challenged in *Broadcast Music* and the split agreement at issue here. First, the Supreme Court specifically noted in *Broadcast Music* the absence of any evidence that blanket licensing "ha[d] the effect, or could have been spurred by the purpose, of restraining competition among individual composers." 441 U.S. at 13, 99 S.Ct. at 1559. In contrast, this Court has determined that both the purpose and the effect of the defendants' split agreement has been anticompetitive in nature. Second, as noted above, the Supreme Court in *Broadcast Music* characterized the blanket license as "to some extent a different product" than licenses granted by individual composers. The blanket license offered efficiencies which could not be obtained through the individual licensing of compositions. Although the defendants in the instant case contend that such efficiencies exist as a result of the split (discussed below), it is quite clear that the split in no way presents distributors with a "new product." Motion pictures continue to be licensed on a theatre-by-theatre basis. The split is simply not necessary to the existence of a market for the exhibitor of motion pictures. Unlike the blanket license, the split agreement can .be "wholly equated with a simple horizontal agreement among competitors." *Id.* at 23, 99 S.Ct. at 1564.

Finally, the Supreme Court in *Broadcast Music* noted the district court's finding that "there was no legal, practical, or conspiratorial impediment to CBS's obtaining individual licenses: CBS, in short, had a real choice." *Id.* at 24, 99 S.Ct. at 1564. Although the defendants in the present case can point to instances in which distributors have been able to license films outside the split, the understandings which exist among the defendants (described in Part III B, *supra*) preclude the distributors from exercising a "real choice" in the licensing of films in Milwaukee.[16]

The differences between the instant case and *Broadcast Music* serve to highlight why the defendants' split agreement must be condemned *per se* as price fixing. Yet the defendants would have this Court refrain from deeming the split a *per se* restraint of trade because the judiciary has not had enough experience with splits to warrant application of the *per se* label. They point out that there has been no chain of cases finding splits to be illegal and note that "the Supreme Court has not added any new *per se* categories in years...." (Defendants' Post-Trial Brief at 118.) They also argue extensively that the Justice Department's position for years that splits were not *per se* illegal is evidence of the potential procompetitive virtues of splitting.

The fundamental flaw in the defendants' argument is that the Government is not seeking to establish here a new *per se* category. A similar argument was rejected by the Supreme Court in *Arizona v. Maricopa County Medical Society, supra.* There, the defendant medical society urged that the *per se* rule should not be applied because the judiciary had had little antitrust experience with the health care industry. The Court stated:

> The argument quite obviously is inconsistent with *Socony-Vacuum.* In unequivocal terms, we stated that, "[w]hatever may be its peculiar problems and

---

**16.** To the extent that the Seventh Circuit's decision in *F.E.L. Publications, Ltd. v. Catholic Bishop of Chicago,* 1982–1 Trade Cas. (CCH) ¶ 64,632 (7th Cir.1982), relies on the blanket license rationale of *Broadcast Music,* it is likewise distinguishable from the instant case.

characteristics, the Sherman Act, so far as price-fixing agreements are concerned, establishes one uniform rule applicable to all industries alike." 310 U.S., at 222, 60 S.Ct., at 843.

\* \* \* \* \* \*

Finally, the argument that the *per se* rule must be rejustified for every industry that has not been subject to significant antitrust litigation ignores the rationale for *per se* rules, which in part is to avoid "the necessity for an incredibly complicated and prolonged economic investigation into the entire history of the industry involved, as well as related industries, in an effort to determine at large whether a particular restraint has been unreasonable—an inquiry so often fruitless when undertaken." *Northern Pac. R. Co. v. United States, supra,* 356 U.S. at 5, 78 S.Ct. at 518.

102 S.Ct. at 2476. The defendants argue that *Maricopa* is distinguishable because it involved direct (as opposed to indirect) price fixing. The *per se* rule against price fixing, however, applies with equal force to arrangements which indirectly affect prices. *See, e.g., Socony-Vacuum, supra; National Society of Professional Engineers, supra.*

■ With regard to the Justice Department's prior position regarding splits, the Court would simply observe that the Justice Department is not given the ultimate responsibility for interpreting acts of Congress, including the Sherman Act. That responsibility is entrusted to the judiciary. Thus, even though a court might look to the Justice Department's official position with regard to a particular business practice as a factor in determining whether the practice falls within a *per se* category, *see Broadcast Music, Inc., supra,* 441 U.S. at 10–16, 99 S.Ct. at 1557–1560, the Justice Department cannot formulate policies which are binding on the courts.[17]

■ The defendants also point to the district court's decision in *Greenbrier Cinemas, Inc. v. Attorney General,* 511 F.Supp. 1046 (W.D.Va.1981), for the proposition that splits must be examined under the rule of reason rather than under the *per se* rule. *Greenbrier* was a declaratory judgment action brought by an exhibitor to challenge the Justice Department's contention in an April 1, 1977, press release that all splits are *per se* illegal. After a trial on the merits, the court held that the Charlottesville, Virginia split had to be evaluated under the rule of reason instead of the *per se* rule.[18]

This Court will not attempt to distinguish or point out disputes it may have with the *Greenbrier* decision. That has been done concisely, and this Court believes, accurately in another case in which splits were held to be illegal *per se, General Cinema Corp. v. Buena Vista Distribution Co.,* 532 F.Supp. 1244, 1265–66 (C.D.Cal.1982).[19] In his deci-

17. The defendants contend that the Justice Department's position in the instant case is also inconsistent with its present position taken in an *amicus* brief filed in *Bd. of Regents of the University of Oklahoma v. National Collegiate Athletic Association,* 707 F.2d 1147 (10th Cir. 1983). In *NCAA,* the Government has urged the Tenth Circuit to examine the alleged price-fixing restraint (a restriction on NCAA members with respect to telecasting football games) under the rule of reason rather than under the *per se* rule. The Government's rationale for its position in *NCAA* is that a lawful joint venture such as the NCAA has legitimate needs that must be taken into account in analyzing conduct under the antitrust laws. The NCAA, unlike the Milwaukee split, depends upon cooperation among its members for the very existence of a market. Like the blanket license at issue in *Broadcast Music, supra,* the product involved in *NCAA, i.e.,* college football, is a new product which exists by virtue of the members' association.

The issue whether the restraint in *NCAA* is *per se* price fixing is not before this Court. However, the Court is satisfied that the distinctions between the instant case and *NCAA* are substantial enough to rebut any claim of inconsistency made by the defendants.

18. The defendants assert that the doctrine of collateral estoppel precludes the Government from disputing the factual findings set forth in *Greenbrier.* The Court does not believe the application of collateral estoppel is appropriate because there is not the requisite identity of factual issues.

19. The *General Cinema* case has been settled by consent decree which, among other things, dissolves the court's permanent injunction prohibiting General Cinema from engaging in split

sion in *General Cinema,* Judge Kenyon provides several reasons why the reasoning in *Greenbrier* should not be followed. Suffice it to say that this Court believes the *General Cinema* decision provides a sounder analysis of splits and why they should be condemned *per se* as price fixing.

Because the Court in the instant case concludes that the defendants' split agreement falls within the "price fixing" category of *per se* violations, it need not weigh the evidence offered by the defendants in regard to the alleged procompetitive benefits achieved by the split.[20] In view of the defendants' purpose and the resulting effect of the split agreement on the price mechanism involved in licensing motion pictures, the split agreement is "conclusively presumed illegal without further examination under the rule of reason. . . ." *Broadcast Music, Inc., supra,* 441 U.S. at 8, 99 S.Ct. at 1556. Nonetheless, the Court will consider briefly the alleged procompetitive benefits identified by the defendants.

▌ The defendants claim the split has the effect of heightening competition among exhibitors, among pictures, among distributors, and among other forms of entertainment. They also assert that the split promotes efficiency in the licensing of films. The essence of all of their arguments in this regard is that a market governed by splitting is better than one which is characterized by bidding. They maintain that under the split, theatres have better pictures playing for longer periods in accordance with the demands of the public. By virtue of the flexibility provided by the

split, argue the defendants, higher levels of attendance can be achieved and maintained. In addition, they contend that the less prominent distributors are able to obtain first-run theatres for their pictures. Such benefits, argue the defendants, were not obtainable under the "chaotic" system in which blind bidding prevailed. The distributors, of course, disagree with these assertions, as indicated by the testimony of various witnesses at trial.

The Court has serious doubts whether the assertions made by the defendants are factually accurate. But in any event, it is not the function of this Court to determine whether a system of splitting is better than one characterized by direct competition among horizontal competitors. "The heart of our national economic policy long has been faith in the value of competition." *Standard Oil Co. v. FTC,* 340 U.S. 231, 248, 71 S.Ct. 240, 249, 95 L.Ed. 239 (1951). "Even assuming occasional exceptions to the presumed consequences of competition, the statutory policy [of the Sherman Act] precludes inquiry into the question whether competition is good or bad." *National Society of Professional Engineers, supra,* 435 U.S. at 695, 98 S.Ct. at 1367. Thus, to the extent that the defendants assert that they have developed a system for licensing films which is more efficient than competition, they are without support in the law.[21]

Nor is there any legal support for the defendants' attempt to justify the split as promoting competition in areas other than the licensing of films. This type of argu-

agreements. However, the consent decree acknowledges that General Cinema now has a corporate policy against splitting and requires General Cinema to inform Buena Vista of any changes in that policy. (*See* Judgment of Consent dated January 31, 1983.) Moreover, in a subsequent decision denying a post-judgment motion to intervene, Judge Kenyon again expressed his view that splitting is a *per se* violation of the antitrust laws. (*See* Order dated April 20, 1983.)

**20.** The defendants also cite as authority for application of the rule of reason several decisions in which vertical restraints were held to be lawful. *E.g., Continental T.V., Inc. v. GTE*

*Sylvania, Inc.,* 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977); *Valley Liquors, Inc. v. Renfield Importers, Ltd.,* 678 F.2d 742 (7th Cir. 1982). These cases are distinguishable by virtue of the vertical nature of the restraints involved, as opposed to the purely horizontal arrangement at issue in the instant case.

**21.** The various complaints the defendants have with respect to blind bidding sound of the "age-old cry of ruinous competition and competitive evils. . . ." *United States v. Socony-Vacuum Co., supra,* 310 U.S. at 221–22, 60 S.Ct. at 843. The defense of competitive abuses has never been allowed as a legal justification for price fixing. *Id.*

ment was rejected by the Supreme Court in *United States v. Topco Associates, Inc.,* 405 U.S. 596, 92 S.Ct. 1126, 31 L.Ed.2d 515 (1972):

> If a decision is to be made to sacrifice competition in one portion of the economy for greater competition in another portion, this too is a decision that must be made by Congress and not by private forces or by the courts. Private forces are too keenly aware of their own interests in making such decisions and courts are ill-equipped and ill-situated for such decisionmaking.

*Id.* at 611, 92 S.Ct. at 1135. Indeed, it would be virtually impossible for this Court to make a factual determination that the restraint on competition created by the split is outweighed by increased competition among theatres for audiences or among theatres and other forms of entertainment in the local market, such as the Milwaukee Brewers and Milwaukee Bucks.

Thus, the Court views the various alleged procompetitive benefits offered by the defendants to be immaterial to the Government's antitrust claim. While the defendants may have genuine business concerns with regard to blind bidding and its attending evils, such concerns are not the concern of this suit. As pointed out by the Government, the defendants have every right to petition the state legislature to establish anti-blind bidding legislation similar to that in force in other states. They may not, however, resort to anticompetitive self help.[22]

In sum, the Court concludes that the defendants' split agreement constitutes price fixing which must be condemned as *per se* illegal under Section 1 of the Sherman Act. The defendants' purpose and the resulting effect on price justifies application of the conclusive presumption that the split unreasonably restrains trade. Moreover, the alleged procompetitive benefits offered by the defendants are not material under prop-

er antitrust analysis. Thus, the split agreement would have to be condemned even under the rule of reason.

### B. *Market Allocation*

As noted earlier, the Government contends that the Milwaukee split should be condemned *per se* not only as price fixing but also as an illegal market allocation.

Market allocation schemes among horizontal competitors have been held to be *per se* violative of Section 1 of the Sherman Act. *See United States v. Topco Associates, Inc.,* 405 U.S. 596, 92 S.Ct. 1126, 31 L.Ed.2d 515 (1972). Such arrangements between competitors may be *per se* unlawful whether they allocate territories, customers, or products. *See* L. Sullivan, *Handbook on the Law of Antitrust* § 81 (West 1977) at 219; *United States v. Cadillac Overall Supply Co.,* 568 F.2d 1078 (5th Cir.), *cert. denied,* 437 U.S. 903, 98 S.Ct. 3088, 57 L.Ed.2d 1133 (1978). A market allocation agreement is unlawful whether engaged in by competing buyers or competing sellers. *See e.g., United States v. Champion International Corp.,* 557 F.2d 1270 (9th Cir.), *cert. denied.,* 434 U.S. 938, 98 S.Ct. 429, 54 L.Ed.2d 298 (1977).

The essence of a market allocation agreement is the horizontal competitors' agreement not to compete with one another in some designated area of trade, whether it be geographic or otherwise. Although it is possible certain procompetitive benefits of market allocations can be identified, the *Topco* decision makes clear that the *per se* rule is nonetheless applicable. *See* 405 U.S. at 596, 92 S.Ct. at 1126. Thus, once a market allocation among horizontal competitors has been identified, it is not necessary to carry the inquiry further. Moreover, it is not necessary that one prove a market allocation scheme has an adverse effect on competition. L. Sullivan, *Antitrust, supra,* § 80 at 217; *Cadillac Overall*

---

**22.** The Court cannot help opining that bidding on a film months in advance of play only because a given star or superstar is involved—without a real opportunity to know the details of plot, supporting cast, photography, special

effects, standards of morality, etc.—does not seem to be a particularly discriminating way to select our national movie fare. But to assess artistic content is not the Court's function.

*Supply Co., supra,* 568 F.2d at 1085; *Sport Shoe of Newark, Inc. v. Ralph Libonati Co., Inc.* 512 F.Supp. 921, 923 (D.Del.1981). However, anticompetitive purpose and effect may be pertinent to the characterization of a particular arrangement as a market allocation:

> As with price fixing, the basic guide is purpose and effect; if division of markets is the goal of the arrangement or the overriding effect, it should be characterized as market division even though it achieves that consequence quite indirectly.

L. Sullivan, *supra,* § 81 at 219.

In his decision in *General Cinema, supra,* Judge Kenyon declined to hold that split agreements were illegal market allocations because the record before him on Buena Vista's summary judgment motion presented factual questions regarding whether splits eliminated *entirely* the competition for licenses by participating exhibitors. 532 F.Supp. at 1255. He went on to express his view that splits would not be illegal *per se* market divisions unless they eliminated *all* competition in a given area for specified films. *Id.* The defendants in the instant case have seized upon this language from *General Cinema,* arguing that the Milwaukee split cannot be classified as a market allocation because it does not eliminate all competition for films. In the defendants' view, an arrangement cannot be characterized a market allocation unless it leaves no room for competition.

 Yet in the context of the split agreement, it is the exhibitors who hold the cards in determining whether competition for particular films will be allowed to occur. The fact that the exhibitors may choose to compete with respect to some films does not mean that the basic split agreement, when adhered to, is any less anticompetitive. Moreover, the Court has determined that the very purpose of the defendants' split agreement has been to eliminate competition among themselves. Whether they have succeeded in doing that altogether is not necessary to the determination that the split is a *per se* market allocation. It is

enough that the defendants have set up a scheme to divide products among themselves with the purpose of eliminating competition with respect to those products. Accordingly, the Court holds that the split agreement must be condemned *per se* as a market allocation as well as price fixing.

## V. RELIEF

 Although the focus of the evidence presented in the instant case was the Milwaukee split agreement, evidence was presented indicating that the defendants are engaged in split agreements in other markets throughout the United States. The Government seeks an order enjoining the defendants from splitting motion pictures anywhere in the country.

There is authority for granting the broad relief sought by the Government, *see United States v. United States Gypsum Co.,* 340 U.S. 76, 88–95, 71 S.Ct. 160, 169–172, 95 L.Ed. 89 (1950), and the Court believes such relief is appropriate here. Although splits may vary in their mechanics from market to market, their essential anticompetitive nature does not change.

For this reason, the Court hereby ORDERS that judgment be entered in favor of the Government and against the defendants, declaring that the defendants are in violation of Section 1 of the Sherman Act, 15 U.S.C. 1, and enjoining the defendants as follows:

> The defendants are hereby enjoined from further engaging in any motion picture split agreements, in any form and with any person, in any motion picture exhibition market throughout the United States.

Such order shall become effective upon the entry of judgment.