**UNITED STATES of America,
Plaintiff-Appellee,**

**v.**

**CAPITOL SERVICE, INC., Kohlberg Theatres Service Corporation, Marcus Theatres Corporation and United Artists Theatre Circuit, Inc., Defendants-Appellants.**

No. 83–2518.

United States Court of Appeals,
Seventh Circuit.

Argued June 4, 1984.

Decided Feb. 28, 1985.

Rehearing and Rehearing En Banc
Denied April 22, 1985.

Peter M. Fishbein, Kay, Scholer, Fierman, Hays & Handler, New York City, for defendants-appellants.

Robert B. Nicholson, U.S. Dept. of Justice, Washington, D.C., for plaintiff-appellee.

Before BAUER and ESCHBACH, Circuit Judges; and EDWARDS, Senior Circuit Judge.[*]

---

[*] The Honorable George C. Edwards, Senior Circuit Judge, United States Court of Appeals for the Sixth Circuit, sitting by designation.

GEORGE CLIFTON EDWARDS, Jr., Senior Circuit Judge.

This is a civil antitrust action brought by the United States Government under Section 1 of the Sherman Act, 15 U.S.C. § 1, against four motion picture exhibitors who operate theatres in the Milwaukee, Wisconsin area. This action was tried to the court in a 4½ week trial. The United States District Court for the Eastern District of Wisconsin, Judge Robert W. Warren presiding, found defendants guilty of Section 1 violations in that the defendants' practice of "splitting," or allocating among themselves, the rights to negotiate for films released by motion picture distribution companies constituted both illegal price fixing and an illegal "scheme to divide products among themselves with the purpose of eliminating competition with respect to those products." *United States v. Capitol Service, Inc.,* 568 F.Supp. 134, 155 (E.D. Wis.1983). Judge Warren issued the following injunction:

> The defendants are hereby enjoined from further engaging in any motion picture split agreements, in any form and with any person, in any motion picture exhibition market throughout the United States.

*Id.* Defendants appeal only the breadth of the injunction.

The District Court's opinion includes 13 pages of factual findings. Its findings of fact are not challenged on appeal. Only those facts necessary to an understanding and resolution of the issues raised by appellants will be repeated here.

The defendants-appellants, Capital Service, Inc. ("Capitol Service"), Kohlberg Theatres Service Corporation ("Kohlberg"), Marcus Theatres Corporation ("Marcus"), and United Artists Theatre Circuit, Inc. ("UATC"), cumulatively operate approximately 90% of the first-run motion picture theatres in the Milwaukee metropolitan area. On November 30, 1977, representatives of each appellant met and formed a "split agreement." The District Court described the agreement as follows:

Under the agreement, the defendants have grouped their theatres that primarily exhibit first-run motion pictures into three units of eleven screens each. On occasion, some of the defendants' theatres that are not included in the three units have been split pictures under the split agreement. Under the agreement, Marcus and UATC each constitute one unit since each has eleven primarily first-run screens in Milwaukee. Capitol Service, which has eight primarily first-run screens, and Kohlberg, which has three primarily first-run screens, together form the third unit. The defendants meet periodically or converse by telephone to split pictures.

The split is a "picture-by-picture" split, meaning particular films are allocated to specific theatres. The exhibitors take turns selecting films for their respective theatres, making sure that no two theatres in the same geographic zone play the same film. Because General Cinema, which is not involved in the split, has two first-run theatres in Milwaukee, the defendants will sometimes "split around" the General Cinema theatres, meaning that they leave a run of the picture open in the event one of General Cinema's theatres obtains a license for the picture. *Id.* at 140–141.

The District Court specifically found that appellants formed the split "for the purpose of eliminating competition among themselves." *Id.* at 142. The split was formed in response to what appellants viewed as the "excessive terms" which resulted from the distribution system previously used in the Milwaukee area—the competitive bid system. *Id.* at 143. Under the competitive bid system, motion picture distributors inform exhibitors of the release of new films by exhibitor solicitation letters. The letters provide a minimum of information about the film and include suggested minimum terms for the licensing of the film. *See Allied Artists Picture Corp. v. Rhodes,* 679 F.2d 656, 660 (6th Cir.1982). The exhibitors then respond with competitive bids for the right to play the film at a particular theater. The bidding process of-

ten results in terms greater than that suggested in the solicitation letters. *United States v. Capitol Service, Inc.*, 568 F.Supp. at 138.

Licensing also occurs by competitive and noncompetitive negotiations. The latter occurring in "closed" or one exhibitor markets. Films are also distributed under the "track" system—a system of distribution to theaters on the basis of an established relationship between the distributor and exhibitor. *Id.* With the exception of the noncompetitive negotiations, all licenses are firm and not subject to downward adjustment following the playing of a picture. This forces exhibitors to bear a portion of the "risk" of producing, distributing, and exhibiting films.

The licensing of films frequently takes place before prints are available for screening. Thus, bids or negotiations are conducted without the exhibitors knowing anything more than a brief plot description and the names of the key personnel involved in making the film. The "blind bid" system is the object of opposition from exhibitors which has resulted in the enactment of anti-blind bidding statutes in at least 23 states. *Id. See Allied Artists Picture Corp. v. Rhodes*, 679 F.2d 656; *Associated Film Distribution Corp. v. Thornburgh*, 683 F.2d 808 (3d Cir.1982); *Warner Bros., Inc. v. Wilkinson*, 533 F.Supp. 105 (D.Utah 1982).

The District Court found that the Milwaukee split consisted of three basic agreements: (1) an agreement not to bid on pictures; (2) an agreement not to negotiate for a picture until it is split; and (3) an agreement not to negotiate for a picture split to another exhibitor. *Id.* at 143–146. The court further found that the split agreement had precisely the desired effect—price competition among the defendants was reduced. *Id.* at 146. The split reduced significantly the number of bids submitted by defendants. It resulted in a substantial reduction in the amount of guarantees paid by defendants to distributors. The number of downward adjustments in film rentals increased. Finally,

the length of playtime for particular films shortened. The District Court concluded that "[e]ach of the above-noted results of the split affected the price paid for films." *Id.* at 147.

The District Court found, that as the agreement constituted price fixing and division of markets, the agreement violated the per se rule of antitrust law. *Northern Pacific R. Co. v. United States*, 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958). *See Arizona v. Maricopa County Medical Society*, 457 U.S. 332, 102 S.Ct. 2466, 73 L.Ed.2d 48 (1982). Thus the agreement did not need to be analyzed under the rule of reason and defendants' arguments concerning alleged benefits from the split did not need to be considered. *See Board of Trade of the City of Chicago v. United States*, 246 U.S. 231, 238, 38 S.Ct. 242, 243, 62 L.Ed. 683 (1918).

The District Court concluded its findings of fact and conclusions by law by noting that "[a]lthough the focus of the evidence presented in the instant case was the Milwaukee split agreement, evidence was presented indicating that the defendants are engaged in split agreements in other markets throughout the United States." *United States v. Capitol Service, Inc.*, 568 F.Supp. at 155.

Appellants' objection on appeal relates to the just quoted sentence. Appellants contend that the District Court lacked sufficient evidence to justify the issuance of a nationwide injunction barring them from engaging in "any motion picture split agreements, in any form...." Appellants do not contest, for purposes of this appeal, the correctness of the District Court's findings and conclusions relating to the Milwaukee split. Nor do they challenge the appropriateness of the District Court's injunction as applied to the Milwaukee geographical area. The narrow issue on appeal is whether the District Court was justified in issuing a nationwide injunction against all forms of split agreements when the trial was limited to the legality of the split entered into by the appellants covering the Milwaukee metropolitan area.

Appellants contend that all splits are not alike and that some splits are legal under Section 1 of the Sherman Act. Appellants contend that each split must be analyzed on its own facts under the rule of reason and that the District Court erred in finding that all splits are *per se* illegal. Splits which provide the split designee only a right of first negotiation, and do not prevent distributors from negotiating with the exhibitor of their choice do not, according to appellants, constitute either illegal price fixing or market allocation and thus are not *per se* illegal.

The position taken by appellants on appeal differs from that taken at trial in that, before the District Court, they insisted that the Milwaukee split was a "good" split and involved only the right of first negotiation, which appellants insist does not constitute a *per se* violation of Section 1 of the Sherman Act. The District Court discussed this contention as follows:

All the split does, maintain the defendants, is allocate among exhibitors the "right of first negotiation" for the films split. As the Court discusses below, however, the so-called "right of first negotiation," even as described by the defendants,[6] is an impediment to price competition in the market.

\* \* \* \* \* \*

The "right of first negotiation" appears to the Court to be an empty phrase used by the defendant exhibitors to describe their agreement to negotiate only for the films allocated to their respective theatres. Once a batch of films has been split, the screens for a particular period of playtime are booked up. A distributor has little chance of entering into meaningful negotiations for the licensing of a film at a theatre other than the split designee because other theatres have been designated for other films.

little substance there is behind the defendants' phraseology.

*Id.* at 143, 145 (footnote omitted).

Appellants rely on *Greenbrier Cinemas, Inc. v. Attorney General,* 511 F.Supp. 1046 (W.D.Va.1981) to support their position that "good" splits do exist. *Greenbrier* involved a declaratory judgment action brought to determine whether a Charlottesville motion picture split was *per se* illegal under Section 1. The trial was "limited to the issue of what the split agreement was, how it operated, and whether the agreement did constitute a *per se* violation of the Act *regardless of any effect it might or might not have had on competition or price." Id.* at 1048 (emphasis added). The court found that the Charlottesville split was limited to a right of first negotiation and that distributors were free to ignore the split and negotiate with any exhibitor they pleased. *Id.* at 1054. The court then concluded that the split was not *per se* illegal under Section 1.

The *Greenbrier* decision has been the subject of criticism both on the grounds of its failure to consider the effect of the split on price or competition and its failure to consider the Supreme Court's decision in *National Society of Professional Engineers v. United States,* 435 U.S. 679, 98 S.Ct. 1355, 55 L.Ed.2d 637 (1978). *See General Cinema Corp. v. Buena Vista Distribution Co.,* 532 F.Supp. 1244, 1265–1266 (C.D.Cal.1982). As the District Court found below, even a limited right of first negotiation has a profound effect on price competition. *United States v. Capitol Service, Inc.,* 568 F.Supp. at 143, 145.

The Supreme Court in *Professional Engineers* addressed "an agreement among competitors to refuse to discuss prices with potential customers until after negotiations have resulted in the initial selection of an engineer." 435 U.S. at 692, 98 S.Ct. at 1365. The Court held that any supposed benefits from the restriction of competition were irrelevant under the appropriate Rule of Reason analysis. *Id.* at 693–696, 98 S.Ct. at 1366–1367. The Court stated that there were two categories of antitrust analysis.

---

[6] When asked during trial how long the "right of first negotiation" for a film would last, Michael Kominsky of Marcus could state only that it lasted a "reasonable amount of time." (Tr. 2961–62). The response tends to show how

In the first category are agreements whose nature and necessary effect are so plainly anticompetitive that no elaborate study of the industry is needed to establish their illegality—they are "illegal *per se*." In the second category are agreements whose competitive effect can only be evaluated by analyzing the facts peculiar to the business, the history of the restraint, and the reasons why it was imposed. In either event, the purpose of the analysis is to form a judgment about the competitive significance of the restraint; it is not to decide whether a policy favoring competition is in the public interest, or in the interest of the members of an industry. Subject to exceptions defined by statute, that policy decision has been made by the Congress.

*Id.* at 692, 98 S.Ct. at 1365 (footnote omitted). The Court went on to note that "[w]hile this is not price fixing as such, no elaborate industry analysis is required to demonstrate the anticompetitive character of such an agreement. It operates as an absolute ban on competitive bidding...." *Id.*

The so-called "good" split which appellants seek to have removed from the prohibition of the injunction, similarly operates as a ban on competitive bidding. The District Court recognized that in theory a right of first negotiation did not preclude competitive negotiations. In fact, however, the time pressures under which the distributors operate preclude them from negotiating with other exhibitors.

Once a batch of films has been split, the screens for a particular period of playtime are booked up. A distributor has little chance of entering into meaningful negotiations for the licensing of a film at a theatre other than the split designee because other theatres have been designated for other films.

*United States v. Capitol Service, Inc.,* 568 F.Supp. at 145.

The anticompetitive character of the so-called "good" split agreement is readily apparent. *See General Cinema Corp. v. Buena Vista Distribution Co.,* 532 F.Supp. at 1260. A right of first negotiation as described by defendants, no matter how flexible in theory, is an agreement among competitors amounting to a horizontal restraint on competition illegal *per se* under Section 1.[1] *White Motor Co. v. United States,* 372 U.S. 253, 263, 83 S.Ct. 696, 702, 9 L.Ed.2d 738 (1963); *Timken Roller Bearing Co. v. United States,* 341 U.S. 593, 71 S.Ct. 971, 95 L.Ed. 1199 (1951). The District Court did not err in enjoining defendants from "engaging in any motion picture split agreements, in any form...."

Appellants also contend that the District Court erred in issuing a nationwide injunction. The basis of appellants' position is that the complaint, discovery, and trial were all limited to the Milwaukee market and that it "is fundamentally unfair to subject defendants to a nationwide injunction in such circumstances." Appellants' brief at 28 n. 15.

1. The Supreme Court decisions in *Broadcast Music, Inc. v. Columbia Broadcasting System, Inc.,* 441 U.S. 1, 99 S.Ct. 1551, 60 L.Ed.2d 1 (1979) and *NCAA v. Board of Regents of the University of Oklahoma, et al.,* —— U.S. ——, 104 S.Ct. 2948, 82 L.Ed.2d 70 (1984) do not militate against a conclusion that the split agreement constitutes a *per se* violation of Section 1. In *Broadcast Music,* the Court examined a horizontal agreement under the Rule of Reason and found it to be legal under Section 1. The Court specifically noted that the blanket licenses at issue were "to some extent a different product" and that there was no evidence that the creation of the new product was prompted by the purpose of restricting competition. *Broadcast Music, Inc. v. Columbia Broadcasting System, Inc.,*

441 U.S. at 13, 22, 99 S.Ct. at 1559, 1563. In *NCAA,* the Court also applied the Rule of Reason to a horizontal agreement. The Court noted, however, the unique circumstances which called for the application of the Rule of Reason rather than the *per se* rule. "[W]hat is critical is that this case involves an industry [college football] in which horizontal restraints on competition are essential if the product is to be available at all." *NCAA v. Board of Regents,* 104 S.Ct. at 2961. Neither of the characteristics unique to blanket licenses or to college football are present in split agreements. Split agreements do not create a new product and horizontal agreements are not essential to the existence of the movie industry.

The issue at trial was the conduct of the appellants in the Milwaukee market. Appellants sought discovery concerning splits in other markets but were limited by the District Court to discovery relating to the operation of the Milwaukee split. On appeal, appellants contend they were denied a full and fair opportunity to litigate the effects of splits in markets outside Milwaukee. *Id.* At trial, however, appellants did not seek nationwide discovery on the effects of splits in other markets but on distributor participation in splits around the country. *United States v. Capitol Service, Inc.,* 89 F.R.D. 578, 582 (E.D.Wis. 1981). The District Court properly ruled that the requested material was not relevant to distributor participation in the Milwaukee split. *Id.*

Having found appellants guilty of conduct which was illegal *per se* under Section 1, it was not an abuse of discretion for the District Court to enjoin appellants from engaging in such conduct anywhere in the United States. Geographical limitations regarding the issues at trial do not alter the court's broad remedial powers. Appellants have conducted their businesses in a manner forbidden by law. The District Court has large discretion in redressing antitrust violations and in fitting the decree to the special needs of the individual cases. *Ford Motor Co. v. United States,* 405 U.S. 562, 573, 92 S.Ct. 1142, 1149, 31 L.Ed.2d 492 (1972). Appellants based their defense at the District Court on the theory that the Milwaukee split was a "good" split. On appeal, appellants contend that although the Milwaukee split may not have been a "good" split, other splits may be conducted in conformance with the law. They wish to be permitted to form such splits. The split described by appellants as a "good" split has been shown to be illegal *per se* under Section 1. There is ample reason to enjoin

appellants from engaging in any such split anywhere in the United States. "When the purpose to restrain trade appears from a clear violation of law, it is not necessary that all of the untraveled roads to that end be left open and that only the worn one be closed." *International Salt Co. v. United States,* 332 U.S. 392, 400, 68 S.Ct. 12, 17, 92 L.Ed. 20 (1947). *See also United States v. Gypsum Co.,* 340 U.S. 76, 88–89, 71 S.Ct. 160, 169–170, 95 L.Ed. 89 (1950); *Otter Tail Power Co. v. United States,* 410 U.S. 366, 381, 93 S.Ct. 1022, 1031, 35 L.Ed.2d 359 (1973) ("The proclivity for predatory practices has always been a consideration for the District Court in fashioning its antitrust decree.").

Appellants also contend that the injunction is imprecise in that "split" is not defined. *See Federal Rules of Civil Procedure* 65(d).[2] We believe, however, that the District Judge carefully defined the term "split" as used in his injunctive order as follows:

1. "an agreement not to engage in competitive bidding,"

2. "an agreement ... not to negotiate for pictures until they have been split," and

3. "an agreement ... not to negotiate for films split to other [exhibitors]."

*United States v. Capitol Service, Inc.,* 568 F.Supp. at 143, 145. We also believe that this definition should be regarded as incorporated into his judgment. It is so ordered.

For the reasons set forth above, the judgment of the District Court is in all respects affirmed.

---

**2.** F.R.C.P. Rule 65(d) reads as follows:

Form and Scope of Injunction of Restraining Order. Every order granting an injunction and every restraining order shall set forth the reason for its issuance; shall be specific in terms; shall describe in reasonable detail, and not by reference to the complaint or other

document, the act or acts sought to be restrained; and is binding only upon the parties to the action, their officers, agents, servants, employees, and attorneys, and upon those persons in active concert or participation with them who receive actual notice of the order by personal service or otherwise.