HARKINS AMUSEMENT ENTERPRISES, INC.; Daniel E. Harkins, individually and dba Tower Plaza Cinema I and II, Plaintiffs/Appellants,

v.

GENERAL CINEMA
CORPORATION, Defendant,

and

The Harry Nace Company; United Artists Theatres, Inc.; American Multi–Cinema, Inc.; Paramount Pictures Corporation; Twentieth Century–Fox Film Corporation; Universal Film Exchanges, Inc.; Warner Bros. Distributing Corp.; Columbia Pictures Industries, Inc.; Avco Embassy Pictures Corp.; Metro–Goldwyn–Mayer, Inc.; United Artists Corporation; Buena Vista Distributing Co., Inc., Defendants/Appellees.

HARKINS AMUSEMENT ENTERPRISES, INC.; Daniel E. Harkins, individually and dba Tower Plaza Cinema I and II, Plaintiffs/Appellants,

v.

GENERAL CINEMA
CORPORATION, Defendant,

and

The Harry Nace Company; United Artists Theatres, Inc.; American Multi–Cinema, Inc.; United Artists Corporation, Defendants/Appellees.

HARKINS AMUSEMENT ENTERPRISES, INC.; Daniel E. Harkins, individually and dba Tower Plaza Cinema I and II, Plaintiffs/Appellants,

v.

GENERAL CINEMA
CORPORATION, Defendant,

and

The Harry Nace Company; American Multi–Cinema, Inc.; United Artists Corporation, Defendants/Appellees.

Nos. 86–2553, 86–15046 and 87–1740.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Sept. 16, 1987.

Decided April 6, 1988.

As Amended April 19 and July 19, 1988.

Edwin Tobolowsky, N. Henry Simpson, Tobolowsky, Prager & Schlinger, Dallas, Tex., David N. Farren, Shimmel, Hill, Bishop & Gruender, P.C., Phoenix, Ariz., for plaintiffs-appellants.

John P. Frank, Lewis & Roca, Phoenix, Ariz., James L. Seal, Harry B. Swerdlow and Rosenfeld, Meyer & Susman, Beverly Hills, Cal., Joel Linzner, Khourie & Crew, San Francisco, Cal., David W. Dow, Mohr, Hackett, Pederson, Blakely, and Randolph, P.C., Phoenix, Ariz., for defendants-appellees.

Before CANBY and BOOCHEVER, Circuit Judges, and IDEMAN,[*] District Judge.

BOOCHEVER, Circuit Judge:

Harkins Amusement Enterprises, Inc., and Daniel E. Harkins (Harkins) appeal district court judgments in favor of numerous antitrust defendants. This case involves an alleged agreement between certain motion picture exhibitors in the Phoenix, Arizona area regarding film licensing. Seven distributors are accused of cooperating in this conspiracy, resulting in competitive injury to Harkins, an independent exhibitor.

The United States District Court for the District of Arizona denied Harkins' request for a continuance of a partial summary judgment motion filed by the film distributors. The motion was granted on each of Harkins' claims, and a separate judgment was entered for the distributors pursuant to Fed.R.Civ.P. 54(b). The court later entered summary judgment in favor of the exhibitors.

We affirm the district court's grant of partial summary judgment to the film distributors and exhibitors on Harkins' claims of unreasonable clearances, discriminatory moveovers, illusory advances and/or guarantees, blind bidding, and shared monopoly. We reverse and remand for trial, however, Harkins' market splitting, bid rigging, and circuit-wide deals claims. We also hold that the district court did not abuse its discretion by denying Harkins' continuance request.

## I. BACKGROUND

Appellant Harkins owned and operated five independent movie theatres in the Phoenix area in the 1970s. In 1977, Harkins sued nine national film distributors and seven regional exhibitors, alleging various theories of conspiracy to restrain trade and monopolization under sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2 (1982).

Phoenix and its suburbs, including Chandler, Glendale, Mesa, Paradise Valley, and Tempe constitute the relevant geographic market in this case. The relevant product markets are the distribution and indoor exhibition of high-quality, first-run motion pictures. The damage period is between 1973 and 1977.

The appellees in No. 86–2553 are film distributors Columbia Pictures Industries, De Laurentis Entertainment Group (formerly Avco Embassy), Paramount Pictures Corp., Twentieth Century Fox Film Corp., Universal City Studios, Warner Bros. Distributing Corp., and United Artists Corp. (the distributors). The appellees in Nos. 86–15046 and 87–1740 are film exhibitors American Multi–Cinema, Inc., The Harry Nace Co., and United Artists Communications, Inc. (the exhibitors).[1] The appeals were consolidated.

Harkins' suit centers on the alleged anticompetitive effects of a motion picture "split." Splits are exhibitor agreements that divide a normally competitive market by allocating pictures to particular mem-

---

[*] Honorable James M. Ideman, United States District Judge, Central District of California, sitting by designation.

1. Distributor defendants Metro–Goldwyn–Mayer, Inc. and Buena Vista Distributing Co. and exhibitor defendants General Cinema Corp., General Cinema of Arizona, Plitt Inter–Mountain Theaters, Inc., and Mann Theaters Corp. of California are no longer parties.

bers and prohibiting bidding for licensing rights to the films assigned. *Exhibitors' Serv., Inc. v. American Multi–Cinema, Inc.*, 788 F.2d 574, 576 (9th Cir.1986); *Dahl, Inc. v. Roy Cooper Co.*, 448 F.2d 17, 20 (9th Cir.1971). Phoenix exhibitors met regularly in the mid–1970s and divided rights to films on a picture-by-picture basis. Harkins was not a split member.

The distributors have repeatedly acknowledged the existence of the Phoenix exhibitor split. Harkins' amended complaint alleged that rather than being mere observers, the distributors "agreed to, acquiesced in, aided and abetted the Exhibitor Defendants in implementing and effectuating this 'split' arrangement." The distributors deny any participation, and argue that they—not an exhibitor such as Harkins—were victimized by the market division scheme.

Harkins alleges seven types of conspiracies in restraint of trade under section 1 of the Sherman Act. They center on a common premise: that unlawful preferential treatment granted by the distributors prevented Harkins from having a fair opportunity to compete with the split member exhibitors. In addition to an unreasonable restraint on competition resulting from licensing films according to the split, Harkins asserts that these concerted preferences included unreasonable clearances, discriminatory moveovers, bid rigging, circuit-wide deals, illusory advances and/or guarantees, and blind bidding.

This conduct also served as the basis of Harkins' endeavor to extend the monopolization prohibition of section 2 to claims of shared monopoly by the exhibitors and distributors.

In April 1979, this action was transferred by the Judicial Panel on Multidistrict Litigation to the Southern District of Texas as part of a nationwide movie antitrust case. *In re Motion Picture Licensing Antitrust Litigation*, 468 F.Supp. 837 (J.P.M.L.1979). Harkins' suit was one of eight consolidated by the Panel.

During the next four years, discovery on issues of a national conspiracy in the motion picture industry was conducted. In July 1983, District Judge John V. Singleton, Jr., on a motion to consolidate the cases for trial, instead remanded them to their original districts.

The clerk's record indicates that this case was not formally remanded to Arizona District Judge Walter E. Craig until late December 1983. Harkins, which admits "[t]he parties had accomplished very little discovery" of a local nature in the eighteen months between the original filing of the suit and the transfer, served document production requests in May 1984. During the next nineteen months, the parties argued by telephone and by mail regarding discovery.

The distributors filed a motion for partial summary judgment on each of Harkins' claims in October 1985. Harkins responded in late November by filing a motion to compel document production. Following a hearing before a magistrate, the parties entered into a discovery stipulation in January 1986. In March 1986, Harkins filed its opposition to the distributors' partial summary judgment motion, consisting largely of discovery from the multidistrict litigation proceedings. In the alternative, Harkins sought a continuance of the motion under Fed.R.Civ.P. 56(f) pending completion of additional local discovery.

The motions were argued before Judge Craig on April 4, 1986. Ruling from the bench, he first denied the continuance and then granted partial summary judgment to the distributors on each of Harkins' claims. Judge Craig died in June 1986, without issuing written findings of undisputed fact and conclusions of law. The case was transferred to Judge Charles L. Hardy, who entered a formal judgment pursuant to Fed.R.Civ.P. 54(b) in July based on Judge Craig's oral ruling.

Exhibitors American Multi–Cinema and United Artists filed motions for summary judgment in June 1986, shortly before the case was transferred to Judge Hardy. The Harry Nace Co. filed a similar motion in August. Judge Hardy granted the exhibitors' motions by minute order in November 1986 and entered a formal judgment in January 1987.

## II. STANDARD OF REVIEW

We review a district court's grant of summary judgment de novo. *Hernandez v. Johnston*, 833 F.2d 1316, 1317 (9th Cir. 1987). "Therefore ... this court sits in the same position as the district court and applies the same summary judgment test that governs the district court's decision." *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

Under Fed.R.Civ.P. 56(c), summary judgment is proper if "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." The "materiality" of a fact is determined by the substantive law governing the claim or defense. *Hernandez*, 833 F.2d at 1317–18.

This court reviews a denial of a Fed.R. Civ.P. 56(f) motion for continuance for abuse of discretion. *Visa Int'l Serv. Ass'n v. Bankcard Holders of Am., Inc.*, 784 F.2d 1472, 1475 (9th Cir.1986); *see Landmark Dev. Corp. v. Chambers Corp.*, 752 F.2d 369, 373 (9th Cir.1985). We cannot simply substitute our judgment for that of the district court to reverse under this standard, but must have a definite and firm conviction that the court below committed a clear error of judgment in the conclusion it reached upon a weighing of the relevant factors. *See Fjelstad v. American Honda Motor Co.*, 762 F.2d 1334, 1337 (9th Cir.1985).

## III. DISCUSSION

### A. THE RECORD ON APPEAL

Although we review a grant of summary judgment de novo, this court is limited to consideration of issues of fact presented to the district court. *See Morrison v. Char*, 797 F.2d 752, 757 (9th Cir.1986); 10 C. Wright, A. Miller & M. Kane, *Federal Practice and Procedure* § 2716, at 650–51 (2d ed. 1983). Because the distributors challenge some of Harkins' proffered evidence and the record is largely the same in both appeals, it is necessary as a threshold matter to determine what papers were presented to Judge Craig.

Harkins' memorandum in response to the distributors' partial summary judgment motion stated that it was supported "by the entire record on file in this action." Harkins therefore contends that *every* exhibit, document, deposition page, or other piece of discovery in this case—including twenty-six boxes of papers submitted with its district court memorandum—was "presented" to Judge Craig, and is subject to de novo review in this case.

■ The distributors argue that only those items referred to in the parties' partial summary judgment memoranda below may be considered. We agree. In a complex case such as this, the judge was not required to examine thousands of additional pages of record even if they were physically presented to him. For this reason, our analysis is limited to the factual assertions raised in Harkins' district court papers, and additional items cited in its appellate briefs have not been considered.

■ The distributors request that we go a step further, and disregard affidavits filed by Daniel Harkins and his film buyer, Carl Smiley, on the theory that they contradict prior deposition testimony. In *Radobenko v. Automated Equip. Corp.*, 520 F.2d 540, 544 (9th Cir.1975), this court held that a plaintiff could not create a "genuine" issue of material fact by merely submitting an affidavit that conflicted with prior sworn statements.

We believe the *Radobenko* rule is inapplicable here. Harkins and Smiley were deposed in 1978, shortly after the suit was filed, and both stated that they were testifying without having reviewed the defendants' documents. With one exception, these alleged contradictions are in fact instances where Harkins and Smiley simply were unable to respond with certainty to specific deposition questions.

Smiley stated in his deposition that the "only clearance problem" he had encountered in Phoenix related to Harkins' Tower Plaza theatre. Yet in his affidavit, Smiley condemned split members' clearance re-

quests generally as being "totally unwarranted and unreasonable." Because this matter was within his personal knowledge in 1978, Smiley's later statement has been disregarded with respect to clearances over any of Harkins' other theatres.

## B. SUMMARY JUDGMENT TO THE DISTRIBUTOR DEFENDANTS

Harkins predictably cites the Supreme Court's decision in *Poller v. Columbia Broadcasting System, Inc.*, 368 U.S. 464, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962), in support of its appeal:

We believe that summary procedures should be used sparingly in complex antitrust litigation where motive and intent play leading roles, the proof is largely in the hands of the alleged conspirators, and hostile witnesses thicken the plot. It is only when the witnesses are present and subject to cross-examination that their credibility and the weight to be given their testimony can be appraised.

368 U.S. at 473, 82 S.Ct. at 491 (footnote omitted). We have noted, however, that *Poller* does not preclude summary judgment in the proper antitrust case. "The language merely teaches caution." *Barnes v. Arden Mayfair, Inc.*, 759 F.2d 676, 680 (9th Cir.1985).

Section 1 of the Sherman Act prohibits "[e]very contract, combination ... or conspiracy, in restraint of trade." 15 U.S.C. § 1 (1982). The Supreme Court made it clear very early that the antitrust laws still recognized the trader's prerogative:

[t]he act does not restrict the long recognized right of trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal.

*United States v. Colgate & Co.*, 250 U.S. 300, 307, 39 S.Ct. 465, 468, 63 L.Ed. 992 (1919).

■ The supplier's right to set terms and choose customers under the *Colgate* doctrine is considered so important that antitrust plaintiffs are required to do more than merely allege conspiracy and unequal treatment in order to take a case to trial. In the Ninth Circuit:

Once the allegations of conspiracy made in the complaint are rebutted by probative evidence supporting an alternative interpretation of a defendant's conduct, if the plaintiff then fails to come forward with specific factual support of its allegations of conspiracy, summary judgment for the defendant becomes proper.

*Barnes*, 759 F.2d at 680 (quoting *ALW, Inc. v. United Air Lines, Inc.*, 510 F.2d 52, 55 (9th Cir.1975)).

The Supreme Court has defined the type of specific factual support necessary to support a conspiracy finding under section 1:

The correct standard is that there must be evidence that tends to exclude the possibility of independent action by the [alleged conspirators]. That is, there must be direct or circumstantial evidence that reasonably tends to prove that the manufacturer and others had a conscious commitment to a common scheme designed to achieve an unlawful objective.

*Monsanto v. Spray–Rite Serv. Corp.*, 465 U.S. 752, 768, 104 S.Ct. 1464, 1473, 79 L.Ed.2d 775 (1984); *see Barnes*, 759 F.2d at 680. On this summary judgment appeal, applying the *Monsanto* standard, we must ultimately determine whether Harkins has presented specific factual support "such that a rational or reasonable jury might return a verdict in its favor based on that evidence." *T.W. Elec. Serv.*, 809 F.2d at 631.

### 1. Active Participation in the Exhibitors' Market Split

■ Under the *Colgate* doctrine, the distributors possessed the absolute right to refuse to license films to Harkins as long as their decisions were based on independent business judgment. *Wilder Enters., Inc. v. Allied Artists Pictures Corp.*, 632 F.2d 1135, 1140 (4th Cir.1980); *see Dahl, Inc. v. Roy Cooper Co.*, 448 F.2d 17, 19 (9th Cir.1971). An exhibitor has a claim, however,

when distributors *participate in the split* and deny the exhibitor access to films. Such an arrangement creates an

impermissible horizontal conspiracy among the exhibitors operating the split and a vertical conspiracy between them and the participating distributors. It is a type of group boycott that violates the antitrust laws. *Klor's v. Broadway–Hale Stores,* 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959). *See Dahl, Inc. v. Roy Cooper Co.,* 448 F.2d 17, 19 (9th Cir.1971).

*Wilder,* 632 F.2d at 1140 (emphasis added).

Harkins contends that it was excluded from fairly competing for films as a result of active participation by the distributors in the Phoenix split. Of course, if the only function of the split was to eliminate competitive bidding by the split members for the distributors' films, it makes no sense to say that the distributors participated in the split. If the split members, in addition to their agreeing not to bid against each other, also agreed to secure the cooperation of distributors in excluding Harkins from the first-run market, then such a combination would constitute a Sherman Act violation. *See United States v. Paramount Pictures,* 334 U.S. 131, 155, 68 S.Ct. 915, 928, 92 L.Ed. 1260 (1948); *United States v. Crescent Amusement Co.,* 323 U.S. 173, 183 n. 5, 65 S.Ct. 254, 259 n. 5, 89 L.Ed. 160 (1944).

■ Although Harkins has not presented direct evidence of a vertical combination between the distributors and exhibitors, "it has long been settled that explicit agreement is not a necessary part of a Sherman Act conspiracy." *United States v. General Motors Corp.,* 384 U.S. 127, 142–43, 86 S.Ct. 1321, 1329, 16 L.Ed.2d 415 (1966). Moreover, "concerted action may be inferred from circumstantial evidence of the defendant's conduct and course of dealings." *Dimidowich v. Bell & Howell,* 803 F.2d 1473, 1479 (9th Cir.1986).

■ Harkins presents four statistics as evidence of active distributor participation:
1) films were licensed to the split-designated exhibitor 85% of the time;

2) Harkins was awarded licenses to only 17 of the 435 films (4%) that were allocated by the split, although it operated 22% of the theatres in the market[2];
3) films were licensed to split members in ninety instances when Harkins had submitted the only written bid;
4) on eighty-nine occasions, the split member's winning bid was undated or dated after offers were formally due.

The distributors insist that their conduct was dictated by prudent business judgment. Licensing films according to the split could have been the natural and intended result of the exhibitors' collective refusal to bid against each other. The distributors would have been victimized by the decreased competition if Harkins' bids were so consistently bad as to leave them no rational economic choice other than to accept split members' bids. On the other hand, if Harkins' bids were often lucrative in light of the anticompetitive nature of the Phoenix market,

> their rejection by the distributors can be explained only as extraordinary exercises of bad judgment or as accommodation to a request by the [exhibitor] circuits for preferential treatment. Since consistently bad business judgment is not to be expected from able and experienced corporate decisionmakers, only the conspiratorial inference is plausible.

*Southway Theatres, Inc. v. Georgia Theatre Co.,* 672 F.2d 485, 501 (5th Cir.1982) (appendix—district court analysis); *see Milgram v. Loew's, Inc.,* 192 F.2d 579, 583 (3d Cir.1951), *cert. denied,* 343 U.S. 929, 72 S.Ct. 762, 96 L.Ed. 1339 (1952).

Harkins attempts to raise a triable issue of fact regarding the quality of its bids by comparing the terms it offered with those of the licensed split member for forty top-grossing films. Written findings were not entered in this case and it is unclear whether the district court found Harkins' bids to be inferior as a matter of law. Our independent review of the data indicates that on a number of occasions, Harkins offered

---

**2.** Although Harkins states that it was awarded 3% of the films, the actual allocation was 3.9%. The 22% figure for theatre operations assumes,

for summary judgment purposes, that all five of Harkins' theatres were within the relevant market. The distributors dispute this fact.

higher or identical guarantees and/or better terms on weekly percentages, length of engagement, house expense, clearance, theatre seating, and holdover allowance. Split members often were late in submitting bids.

The distributors defend by pointing to the low guarantees Harkins offered for the sixteen most successful films of 1976 and 1977. While recognizing the importance of this component in the licensing process, we cannot conclude that overall, Harkins' bids were so poor as to fail to raise a triable issue of fact whether the distributors' consistent pattern of awarding films to designated exhibitors in the midst of an admittedly anticompetitive market was justified.[3]

The bid-quality data and overall statistical imbalance constitute only a portion of the "specific factual support" Harkins offers to meet its summary judgment burden under *Barnes*, 759 F.2d at 680. Other evidence in the record reasonably suggests active distributor participation in the market division scheme. For example, film buyer Pat Notaro, who as "split captain" coordinated the exhibitor meetings, acknowledged in his deposition that there was a "working understanding" that distributors dissatisfied with a particular split designee could seek a collective "course of action" in reallocating a film.

Although he did not allude to a specific agreement, Notaro testified that occasionally, "the distributor would call me and say I am not playing this theater. You are going to have to do something, go back and do something to satisfy me." In such cases, Notaro said "it was incumbent upon members of the split to make sure that that distributor was satisfied with a theater he would be happy to play in." General Cinema's Lawrence Lapidus testified that it was a common practice for distributors to request these "re-splits," although the evidence was in conflict regarding their frequency.

In addition, American Multi–Cinema's Arnold Shartin stated that distributors would "call up and ask [whether] you had the split meeting.... If not when are you going to have it, if so where did my picture —who got my picture." Shartin at one point characterized the distributors as inquiring "where is my picture going to play." Harkins also produced a document from distributor Universal's records stating, "PHOENIX—SPLIT SITUATIONS— WE BELONG TO PACIFIC," theatres operated by exhibitor Nace. Nace's John Lewis testified that Universal never refused to license a film he had picked on the split.

Viewed collectively, this circumstantial evidence "tends to exclude the possibility of independent action" by the distributors. *Monsanto v. Spray–Rite*, 465 U.S. at 768, 104 S.Ct. at 1473. Harkins has presented factual support of a conspiracy between exhibitors and individual distributors to split the Phoenix film market and unreasonably restrain competition. In order to withstand summary judgment, an issue of material fact need not be conclusively resolved; "rather, all that is required is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *First Nat'l Bank v. Cities Serv. Co.*, 391 U.S. 253, 288–89, 88 S.Ct. 1575, 1592–93, 20 L.Ed.2d 569 (1968); *T.W. Elec. Serv.*, 809 F.2d at 630. Harkins has met its burden on this issue.

We emphasize that our reversal on this claim is limited to the alleged horizontal combination by the exhibitors and the vertical agreement between split members and *individual* distributors. No evidence of a conspiracy *between* any distributors was presented, and Harkins may not pursue this theory on remand.

Harkins argues that this type of market splitting is illegal *per se*. This court has never ruled on the matter, but in *Exhibi-*

---

**3.** In addition to the 85% correlation between split designees and the actual film licensees, Harkins has presented uncontroverted evidence that exhibitors would sometimes "trade" rights to assigned films. The distributors actually licensed films to split members 97% of the time. This figure includes six occasions in which both Harkins and an exhibitor defendant were licensed the same film.

*tors' Serv., Inc. v. American Multi–Cinema, Inc.,* 788 F.2d 574, 578 n. 5 (9th Cir.1986), we pointed out that "[o]ther courts have found similar split agreements to be horizontal restraints on competition that are *per se* illegal under Section One." *See United States v. Capitol Serv., Inc.,* 756 F.2d 502, 506 (7th Cir.), *cert. denied,* 474 U.S. 945, 106 S.Ct. 311, 88 L.Ed.2d 288 (1985); *General Cinema Corp. v. Buena Vista Distribution Co.,* 532 F.Supp. 1244, 1279 (C.D.Cal.1982). *Contra, Greenbrier Cinemas, Inc. v. Attorney General,* 511 F.Supp. 1046, 1060 (W.D.Va.1981). The view of splits as *per se* violations has usually referred, however, to its effects as a combination of buyers against a seller victim, which is not the situation here.

■ Courts have not regarded all concerted refusals to deal as illegal *per se,* but "rather have applied the rule of reason where the economic impact of the challenged practice is not obvious." *Dimidowich v. Bell & Howell,* 803 F.2d 1473, 1480 (9th Cir.1986); *see Charley's Taxi Radio Dispatch Corp. v. SIDA of Hawaii, Inc.,* 810 F.2d 869, 877 (9th Cir.1987). *Per se* treatment is appropriate, however, "where joint efforts by firms disadvantage competitors by inducing suppliers or customers to deny relationships the competitors need in order to compete." *Dimidowich,* 803 F.2d at 1480. *See Northwest Wholesale Stationers v. Pacific Stationary & Printing Co.,* 472 U.S. 284, 294, 105 S.Ct. 2613, 2619, 86 L.Ed.2d 202 (1985).

We conclude that the split agreement alleged here falls within the latter category, and if proven, is illegal *per se.* The district court should instruct the jury accordingly on remand.

### 2. Unreasonable Clearances

In *United States v. Paramount Pictures, Inc.,* 334 U.S. 131, 159–60, 68 S.Ct. 915, 930–31, 92 L.Ed. 1260 (1948), the Supreme Court held that film licensing provisions that discriminate against small independent exhibitors in favor of large circuits "are included among the restraints of trade which the Sherman Act condemns." Harkins alleges that the distributors and exhib-

itors combined to stifle its competitive efforts through a system of unreasonable clearances granted in conjunction with the split. This argument lacks support and partial summary judgment was proper.

Clearance is a contract term allowing an exhibitor a degree of exclusivity within a particular market. "Clearances preclude distributors from licensing other theaters, either specifically named or encompassed in a named geographic area, from showing a movie while it is being exhibited by the theater whose bid is accepted." *Theee Movies of Tarzana v. Pacific Theatres, Inc.,* 828 F.2d 1395, 1397 (9th Cir.1987).

■ As vertical nonprice restraints, clearances are evaluated under the rule of reason. *Id.* at 1398; *see Continental T.V., Inc. v. GTE Sylvania Inc.,* 433 U.S. 36, 58–59, 97 S.Ct. 2549, 2561–62, 53 L.Ed.2d 568 (1977). Clearances that are "unduly extended as to area or duration," or granted over theatres "not in substantial competition," may be unreasonable under section 1. *Paramount Pictures,* 334 U.S. at 145–46, 68 S.Ct. at 923–24; *see Theee Movies,* 828 F.2d at 1399; *Twentieth Century Fox Film Corp. v. Goldwyn,* 328 F.2d 190, 201 (9th Cir.), *cert. denied,* 379 U.S. 880, 85 S.Ct. 143, 13 L.Ed.2d 87 (1964).

■ We agree with the distributors that an extended rule of reason analysis is unnecessary on this issue because Harkins has failed to provide any factual predicate for its clearance claim. Most of Harkins' arguments before the district court were general and conclusory. For example, Paramount Pictures was alleged to have discriminated by granting American Multi–Cinema's Town & Country theatre clearance over Harkins' Camelview theatre, which is fifty blocks away, while refusing to clear the UA 6 theatre only thirty-five blocks away. Yet this claim was not substantiated with particular dates or film titles.

In a rare specific example, Harkins argues that it was unreasonable for the UA 5 theatre to have been granted clearance for "The Turning Point" over Harkins' Tower Plaza, while the Town & Country was not

cleared. This would make sense in terms of geography, however, because the Tower Plaza lies *closer* to the UA 5 than does the Town & Country. Other allegations are simply wrong. Harkins cites Smiley's deposition to support its claim that the Town & Country is closer to Nace's University theatre than is the Tower Plaza, which Nace regularly cleared. Smiley's testimony states, and a Phoenix map confirms, that the Town & Country in fact is farther away.

### 3. Discriminatory Moveovers

■ "A moveover is the privilege given a licensee to move a picture from one theatre to another as a continuation of the run at the licensee's first theatre." *Paramount Pictures*, 334 U.S. at 160 n. 13, 68 S.Ct. at 930 n. 13. Moveovers also occur when an exhibitor is allowed to shift a picture to a different screen at a multiplex theatre. These allowances are not inherently anticompetitive, *Admiral Theatre Corp. v. Douglas Theatre Co.*, 585 F.2d 877, 886 n. 7 (8th Cir.1978), but distributor discrimination against small, independent exhibitors in granting moveovers is prohibited by the Sherman Act. *Paramount Pictures*, 334 U.S. at 160, 68 S.Ct. at 930.

■ Licensing contracts normally specify the theatre or screen where a film may be exhibited and prohibit moveovers without permission. Harkins claims that the distributors prevented it from moving first-run films while expressly granting split members the privilege or allowing them to violate their contracts with impunity. The distributors deny discriminating and downplay the charge, stating that "a shift of film within a structure is hardly big news."

A number of successful films allegedly were moved by split members, including United Artists' "Network" and "Rocky"; Fox's "Silver Streak"; Paramount's "Looking for Mr. Goodbar"; Universal's "Jaws"; and Avco's "The Sailor Who Fell From Grace With the Sea." Yet even if these moveovers benefited the exhibitors, section 1 could not have been violated unless the distributors' permission or acquiescence was part of an agreement to deny Harkins the same privilege.

Harkins has totally failed to support this discrimination claim. Despite maintaining throughout the litigation that it was never allowed to move first-run films, Harkins could not specify a single instance in which the privilege was denied. Because "the nonmoving party may not rely on the mere allegations in the pleadings in order to preclude summary judgment," *T.W. Elec. Serv.*, 809 F.2d at 630, we affirm the district court.

### 4. Bid Rigging

Competitive bidding was normally used to license films in the Phoenix market during the relevant period. Under this process, invitations to bid—sometimes suggesting acceptable terms—were issued to various exhibitors. If the licensing offers received were unsatisfactory, distributors "re-bid" the film on a large-scale basis or otherwise negotiated terms with a limited number of exhibitors.

■ Concerted action to eliminate competitive bidding violates the Sherman Act. *United States v. Champion Int'l Corp.*, 557 F.2d 1270, 1272–73 (9th Cir.), *cert. denied*, 434 U.S. 938, 98 S.Ct. 429, 54 L.Ed.2d 298 (1977); *United States v. Brighton Bldg. & Maintenance Co.*, 598 F.2d 1101, 1106 (7th Cir.), *cert. denied*, 444 U.S. 840, 100 S.Ct. 79, 62 L.Ed.2d 52 (1979). Harkins alleges that the distributors communicated the terms of its bids to split members, enabling those exhibitors to make better offers, submit late bids, or circumvent the entire bidding process. While an individual distributor need not utilize competitive bidding, it may not employ a rigged system as a means of effectuating an agreement to allocate its films only to a concerted group, organized to exclude a competitor.

■ A large volume of statistical evidence was presented to the district court in support of this bid-rigging claim, much of which we noted in our earlier discussion of the distributors' role in the market split. *See supra* at 484. This data includes bid comparisons for forty films, a list of

eighty-nine films licensed to exhibitors whose bids were undated or submitted after the due date, and a list of ninety films awarded to split members in which Harkins submitted the only written bid.

Harkins' most dramatically worded allegations—that split members' nonrefundable guarantees were "transformed" into refundable advances and that distributors "destroyed" favored exhibitors' bids in order to accept newer, better ones—lack specific support in the record. Particular reference is made, however, to the circumstances surrounding the licensing of "Star Wars" and "Funny Lady."

Plitt Theatres was assigned "Star Wars" at an October 1976 split meeting. Harkins' bid of November 23, 1976, the only one submitted to Twentieth–Century Fox, was rejected on December 2. In a December 7 letter, Fox announced a re-bid, stating, "WE WILL ATTEMPT TO ENTER INTO NEGOTIATIONS WITH THE THEATRE OR THEATRES WE CONSIDER MOST LIKELY TO GIVE US SATISFACTORY TERMS AND MAXIMUM FILM RENTAL." Harkins responded with a second bid on December 27. Unbeknownst to Harkins and contrary to Fox's letter, "Star Wars" had already been licensed to Plitt on December 1, six days *before* the announced re-bid.

In addition, each of the terms in Harkins' written bid for "Funny Lady," again the only bid submitted, was superior to the contract awarded by Columbia Pictures to split member General Cinema. Moreover, the contract was dated nearly three months *after* bids on the film were due.

The distributors fail to explain the peculiar sequence of events in these examples. They instead attempt to pass off the bid rigging claim as a "boiler plate" antitrust pleading and contend that the 1978 deposition statements made by Harkins and Smiley before the production of documents preclude a finding of antitrust liability. We disagree. The evidence presented, especially that regarding the "Star Wars" scenario, raises at least a reasonable inference that Harkins was victimized by tainted bidding procedures. The district court's summary judgment grant was therefore improper on this issue.

### 5. Circuit–Wide Deals

■ Harkins alleges that the distributors allowed split members to abuse the buying power of their large circuits by licensing theatres nationally rather than on a film-by-film, theatre-by-theatre basis in a geographic market. Harkins also claims that national fee-settlement adjustments were granted. Circuit-wide deals, or "master agreements," were declared anticompetitive by the Court in *Paramount Pictures*:

> [M]aster agreements are unlawful restraints of trade.... [T]hey eliminate the possibility of bidding for films theatre by theatre. In that way they eliminate the opportunity for the small competitor to obtain the choice first runs, and put a premium on the size of the circuit. They are, therefore, devices for stifling competition and diverting the cream of the business to the large operators.... It is hardly necessary to add that distributors who join in such arrangements by exhibitors are active participants in effectuating a restraint of trade....

334 U.S. at 154–55, 68 S.Ct. at 927–28. Circuit-wide deals are evaluated under the rule of reason. *See United States v. Griffith*, 334 U.S. 100, 108, 68 S.Ct. 941, 946, 92 L.Ed. 1236 (1948).

The distributors' argument that the record does not contain even a scintilla of evidence of circuit-wide deals is mistaken. Harkins has presented abundant factual support of this claim and partial summary judgment was improper. For example, at least four witnesses testified that United Artists was involved in national licensing of the film "A Bridge Too Far." Nace's Lewis stated that this circuit-wide deal, which encompassed the Phoenix market, was "common knowledge" within the industry.

There was also testimony from a variety of witnesses that Columbia Pictures and Avco Embassy entered into a distribution agreement with ITC, an English film producer, whereby General Cinema was grant-

ed nationwide "preemptive rights" to license certain films. These films, cofinanced by General Cinema, included "The Eagle Has Landed," "March or Die," "The Cassandra Crossing," "Capricorn I," "Voyage of the Damned," and "The Domino Principle." Finally, documents were produced indicating that Columbia had granted circuit-wide fee adjustments to General Cinema on "Funny Lady," "Shampoo," and "Tommy."

The distributors also contend that Judge Singleton's remand of the eight consolidated cases in MDL 366 following nationwide discovery proves that Harkins' claim lacks merit. It actually suggests the opposite. Although Judge Singleton refused to consolidate the cases for trial, he recommended that the district courts allow the plaintiffs "to amend their complaints to add an issue of national character."

### 6. Illusory Advances and/or Guarantees

■ It is standard practice in the motion picture industry for distributors to require exhibitors to pay an advance or guarantee. Advances are refundable payments applied toward a film's rental fee. Guarantees are nonrefundable minimum payments. Licensing agreements normally require that these payments be made in cash prior to the film's release.

Harkins claims that while the distributors always strictly enforced the advance and guarantee provisions of its licensing contracts, larger exhibitors were unlawfully granted preferential treatment. This alleged discrimination consisted of granting credit allowances in some cases and not requiring the payments be made at all in others. Harkins posits that contracting for a large but illusory guarantee could allow manipulation of the competitive bidding process in light of the importance of this ingredient in a licensing offer.

Two incidents are cited involving distributor Universal City Studios and split member General Cinema, the nation's largest exhibitor. First, Harkins claims that its review of Universal's records show that General Cinema did not pay any part of a

$71,500 guarantee required in its licensing agreement for the film "Front Page." Second, an $80,000 guarantee for "Midway" was paid to Universal in installments, the last made seven weeks after the film's release.

The distributors contend that at most, the record suggests only that credit was extended in a few isolated situations to a deserving exhibitor. We agree that this evidence is hardly probative of a scheme to undermine competitive bidding. Even if it were, the district court's partial summary judgment grant still would have been proper, because Harkins has not shown any evidence of discrimination. Although he was always required to pay guarantees in cash prior to a film's engagement and characterized credit allowances as "very ... abnormal," Daniel Harkins admitted never asking for the privilege.

### 7. Blind Bidding

■ Under a blind bidding system, distributors require exhibitors to submit bids for films without first having an opportunity to view them. Harkins contends that this practice—illegal by statute in many states—is inherently anticompetitive because it tampers with price structures and unreasonably shifts the risk of loss to exhibitors. Harkins also claims that the distributors granted split members preferential treatment by providing them with advance screenings of films that were later ostensibly blind bid.

The Supreme Court noted in *Paramount Pictures* that while blind bidding did not restrict competition to the same extent as some practices, it was nevertheless "capable of some abuse." 334 U.S. at 157 n. 11, 68 S.Ct. at 929 n. 11. We read this passage to mean that blind bidding is not illegal *per se*. Harkins has not presented any evidence that blind bidding adversely affected competition in the Phoenix market so as to violate the rule of reason.

The distributors concede that discriminating by allowing favored exhibitors to "sneak a peek" while excluding others would be actionable under section 1, but insist that this did not occur. Harkins at-

tempts to support its allegation with deposition testimony by Daniel Harkins and General Cinema's Barry Reardon regarding what they had been told about the films "Star Wars," "The Exorcist," "The Eagle Has Landed," and "Lucky Lady." Yet these statements constituted "hearsay evidence [which] is inadmissible and may not be considered by this court on review of a summary judgment." *Blair Foods, Inc. v. Ranchers Cotton Oil*, 610 F.2d 665, 667 (9th Cir.1980).

Because Harkins otherwise has failed to raise a triable issue regarding blind bidding, the district court's grant of partial summary judgment is affirmed.

### 8. *Shared Monopoly*

Section 2 of the Sherman Act prohibits monopolization, attempted monopolization, and conspiracy to monopolize. 15 U.S.C. § 2 (1982). In its amended complaint, Harkins alleges that by engaging in bid rigging, circuit-wide deals, illusory advances and/or guarantees, and blind bidding, the distributors "have entered upon a systematic plan to form a shared monopoly, attempt to form a shared monopoly and conspire to form a shared monopoly" in the Phoenix film market.

Section 2 applies to "[e]very person who shall monopolize." *Id.* Because oligopoly markets—those with few sellers—often exhibit the lack of competition, high prices, and low output of monopoly markets, commentators have suggested that section 2 could be invoked to attack a shared monopoly even though no individual firm possessed the power to control prices or exclude competition. *See* P. Areeda & D. Turner, *Antitrust Law* ¶¶ 840–845 (1978); L. Sullivan, *Handbook of the Law of Antitrust* § 124 (1977).

Harkins' theory is a novel one; Professors Areeda and Turner admit that "no case has held the § 2 monopolization provision applicable to shared monopoly." P. Areeda & D. Turner, *Antitrust Law*, at ¶ 842. One court directly addressing the issue stated bluntly, "an oligopoly, or a shared monopoly, does not in itself violate § 2 of the Sherman Act." *Consolidated*

*Terminal Systems, Inc. v. ITT World Communications, Inc.*, 535 F.Supp. 225, 228–29 (S.D.N.Y.1982).

We need not decide whether the shared monopoly theory may be viable under some circumstances. Suffice it to say that in this case, involving a small market with numerous sellers, no claim is stated under section 2. Not only is there no case support for Harkins' position, but the suggestions in the learned treatises do not extend the theory this far. Partial summary judgment on the section 2 claims against the distributors is affirmed.

### C. RULE 56(f) MOTION

As an alternative to its opposition to the distributors' partial summary judgment request, Harkins asked Judge Craig to continue the matter. Fed.R.Civ.P. 56(f) provides that a court may order the continuance of a party's summary judgment motion to allow the nonmoving party to obtain affidavits, take depositions, or conduct other discovery. Harkins sought to bolster its case by gathering additional documents and deposing the distributors' local representatives.

Because the continuance was framed in the alternative, appeal of its denial is moot as to the three claims we remand for trial. The issue is therefore limited to the propriety of Judge Craig's decision with respect to Harkins' other allegations. Harkins insists that it was an abuse of discretion to deny the motion in light of the complexity of the suit and the distributors' alleged recalcitrance in producing documents. A review of the circumstances surrounding this litigation does not leave us with a definite and firm conviction that the district court committed a clear error of judgment, *Fjelstad v. American Honda Motor Co.*, 762 F.2d 1334, 1337 (9th Cir.1985), and we affirm.

The district court denied the Rule 56(f) motion because the case was more than eight years old and "fundamentally, counsel on both sides have had plenty of opportunity to complete discovery long before now." Following eighteen months in the Arizona district court and four years in

Texas as part of the multidistrict litigation, the case was formally remanded to Judge Craig in December 1983. Although Harkins served document requests four months later, it did not file a motion to compel production until November 1985—seven weeks after the distributors moved for partial summary judgment.

Harkins maintains it was merely attempting to comply with a local rule requiring that sincere efforts to agree on discovery be made before seeking a court order. Yet the record discloses an inordinate amount of unproductive correspondence related to discovery during this nineteen-month interim. Harkins' counsel threatened to file a motion to compel as early as February 1985, and the distributors' "final position" regarding certain document requests was outlined in a June 1985 letter. On this record, we cannot hold that the trial court abused its discretion by denying the continuance.

### D. SUMMARY JUDGMENT TO THE EXHIBITOR DEFENDANTS

Harkins sued the split member exhibitors under the same theories of conspiracy to restrain trade and shared monopoly as it did the distributors. Following Judge Craig's death, the case was transferred to Judge Hardy, who formally entered judgment in favor of the distributors and considered motions by the exhibitors for summary judgment. Judge Hardy granted the motions in January 1987.

The exhibitors contend that the "law of the case" rule required the district court to enter summary judgment for them as well on Harkins' six claims requiring assistance from the distributors: unreasonable clearances, discriminatory moveovers, bid rigging, circuit-wide deals, illusory advances and/or guarantees, and blind bidding. This rule ordinarily precludes a court from reexamining an issue previously decided by it or a higher appellate court in the same case. *Moore v. Jas. H. Matthews & Co.*, 682 F.2d 830, 833 (9th Cir.1982).

The exhibitors' argument was justified in the district court. The decision regarding the distributors' conduct was appealed, however, and to the extent that we reversed the original judgment the law of the case was altered. Because our earlier review of the record discloses genuine issues of material fact regarding bid rigging and circuit-wide deals, we reverse and remand those claims against the exhibitors for trial.

Triable issues also exist as to distributor participation in the market split. Harkins is therefore a proper party to sue the exhibitors on this claim, and we reverse this portion of the judgment. *Cf. Dahl, Inc. v. Roy Cooper Co.*, 448 F.2d 17, 20 (9th Cir. 1971); *Wilder Enters., Inc. v. Allied Artists Pictures Corp.*, 632 F.2d 1135, 1140 (4th Cir.1980); *see Exhibitors' Serv., Inc. v. American Multi–Cinema, Inc.*, 788 F.2d 574, 578–79 & n. 4 (9th Cir.1986).

Harkins contends that a stipulation approved by the district court effectively precluded the exhibitors from challenging any of Harkins' allegations. It provided that the sufficiency of Harkins' evidence would "not be made an issue in these summary judgment proceedings (except insofar as may have previously been determined in connection with the Distributor Defendants' summary judgment motions)." That exception applied, and in accordance with our earlier discussion we affirm the grant of summary judgment to the exhibitors on Harkins' claims of unreasonable clearances, discriminatory moveovers, illusory advances and/or guarantees, and blind bidding. Finally, summary judgment for the exhibitors on the shared monopoly claim under section 2 is also affirmed.

### IV. CONCLUSION

The record indicates that Harkins has presented specific facts to support its antitrust allegations of market splitting, bid rigging, and circuit-wide deals against the film distributors and exhibitors. We therefore reverse the district court's grant of summary judgment and remand these claims for trial.[4] We affirm the partial

---

4. The distributors brought their partial summa-

ry judgment motion jointly, and have not at-

summary judgments on Harkins' claims of unreasonable clearances, discriminatory moveovers, illusory advances and/or guarantees, blind bidding, and shared monopoly, and hold that it was not an abuse of discretion to deny a continuance under Fed.R. Civ.P. 56(f).

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.

tempted to argue that some are entitled to judgment on certain claims while others are not. At this stage of the proceeding, therefore, we have not attempted to make such a delineation.

Since Harkins has raised a triable issue of a conspiracy among the exhibitors, our decision applies to all of the exhibitors.